UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ANDREW HESS,

Plaintiff,

v.

OAKLAND COUNTY, MICHIGAN; KAREN McDONALD, Oakland County Prosecutor, Oakland County, Michigan; JOE ROZELL, Director of Elections, Oakland County, Michigan; MICHAEL J. BOUCHARD, Oakland County Sheriff, Oakland County, Michigan; and MATTHEW PESCHKE, Sergeant, Oakland County Sheriff's Office, Oakland County, Michigan,

Defendants.

No. 2:25-cv-10665-GAD-KGA

Hon. Gershwin A. Drain

**DECLARATION OF ROBERT J. MUISE**

I, Robert J. Muise, make this declaration pursuant to 28 U.S.C. § 1746 and based on my personal knowledge and upon information and belief where noted.

1. I am an adult citizen of the United States and counsel for Plaintiff Andrew Hess in this case. I also represented Andrew Hess in the criminal case filed against him by Defendant Karen McDonald in state court in April 2024. The case number for the criminal case in the 50th District Court for Oakland County, Michigan was No. 240538-FY. Accordingly, I have personal knowledge of the filings and proceedings in that case, which was dismissed by the District Court on

March 6, 2025, following the decision of the Michigan Court of Appeals in *People v. Kvasnicka*, No. 371542, 2025 Mich. App. LEXIS 1202 (Ct. App. Feb. 13, 2025).

2. Attached to this declaration as Exhibit A is a true and correct copy of Volume I of the transcript of the preliminary examination held in the 50th District Court.

3. Exhibit B to this declaration is a true and correct copy of the video of the public comment made by Plaintiff during the election recount held on December 15, 2023. This exhibit was admitted by the People as Exhibit 1 during the preliminary examination. Exhibit B will be filed in the traditional manner.

4. Attached to this declaration as Exhibits C and D are true and correct photographs that are screenshots taken from the video at Exhibit B. These photographs show the Oakland County deputies watching with their arms folded as Plaintiff makes his speech during the public comment period of the recount. These photographs were admitted as defendant's Exhibits C and D during the preliminary examination.

5. The defendant (Plaintiff Hess) requested that these deputies testify during the preliminary examination. The District Court denied the witnesses. The Oakland County Circuit Court remanded the case to the District Court to permit this testimony. However, the case was dismissed by the District Court before the testimony could be taken.

6. Exhibit E to this declaration is a true and correct copy of the bodycam video of the Oakland County deputy who conducted the initial investigation of the alleged "terrorist threat" during the election recount on December 15, 2023. More specifically, this video shows the deputy's interview with Plaintiff. This exhibit was proffered as Exhibit E by the defendant during the preliminary examination. Exhibit E will be filed in the traditional manner.

7. Attached to this declaration as Exhibit F is a true and correct copy of the written statement provided by Plaintiff to the Oakland County deputy during the initial investigation of the alleged "threat" on December 15, 2023. The bodycam video of Exhibit E shows Plaintiff writing out this statement and submitting it to the deputy. This statement was part of the Case Report that the People disclosed pursuant to the defendant's discovery request.

8. Attached to this declaration as Exhibit G is a true and correct copy of the arrest warrant issued for the arrest of Plaintiff. Plaintiff voluntarily turned himself in. Following his initial appearance, Plaintiff was ordered to go to the Oakland County Jail for fingerprinting, where he spent approximately two hours in a jail cell while several of his family members nervously waited in the parking lot for his release.

9. Attached to this declaration as Exhibit H is a true and correct copy of the bond conditions for Plaintiff.

10. Upon information and belief, attached to this declaration as Exhibit I is a letter from the Wayne County Clerk directing Plaintiff to surrender his Michigan Concealed Pistol License (CPL). Plaintiff complied with this directive.

11. Attached to this declaration as J is a true and correct copy of the Order issued by the Michigan Supreme Court on March 28, 2025 in *People v. Kvasnicka*, SC Case No. 168181.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on the 1st day of April 2025.

/s/ *Robert J. Muise*
Robert J. Muise

# EXHIBIT A

STATE OF MICHIGAN

IN THE 50TH DISTRICT COURT FOR THE COUNTY OF OAKLAND

_____________________________________

THE PEOPLE OF THE STATE OF MICHIGAN

v Case No. 240538-FY

ANDREW FRED HESS,

Defendant.

_____________________________________/

PRELIMINARY EXAMINATION - VOLUME I

BEFORE THE HONORABLE RONDA M. FOWLKES GROSS, DISTRICT JUDGE

Pontiac, Michigan - Thursday, May 30, 2024

For the People: JEFFREY S. HALL (P48613)
Assistant Prosecutor
Oakland County Prosecutor Office
1200 North Telegraph Road
Pontiac, Michigan 48341
(248) 975-4275

For the Defendant: ROBERT JOSEPH MUISE (P62849)
Co-Founder & Senior Counsel
American Freedom Law Center
3000 Green Road Unit 131098
Ann Arbor, Michigan 48113-7756
(734) 635-3756

Recorded by: Gwendolyn D. Jefferson, CER-7127
Certified Electronic Recorder
(248) 758-3875

TABLE OF CONTENTS


| WITNESSES: People | PAGE |
|---|---|
| JOSEPH ROZELL | |
| Direct examination by Mr. Hall | 6 |
| Cross-examination by Mr. Muise | 38 |
| Redirect examination by Mr. Hall | 63 |
| KAITLYN HOWARD | |
| Direct examination by Mr. Hall | 66 |
| Cross-examination by Mr. Muise | 75 |

WITNESSES: Defendant

None

| EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| PX#1 video-statement of defendant at recount | 5 | 5 |
| DX A statement - Mr. Rozell | 44 | - - - |
| DX B | _ _ _ | _ _ _ |
| DX C snapshot-public comment | 54 | 55 |
| DX D snapshot-public comment | 54 | 55 |

50TH District Court

Pontiac, Michigan

Thursday, May 30, 2024 - 10:19 a.m.

THE COURT: Calling the Hess matter, 240538-FY; People versus Andrew Hess. Mr. Prosecutor, your appearance followed by Defense's.

MR. HALL: Jeff Hall appearing on behalf of the People.

MR. MUISE: Thank you, your Honor. Robert Muise on behalf of the defendant, Mr. Hess.

THE COURT: This is date and time scheduled for an exam in this matter. Do we have any stipulations?

MR. HALL: There's a sequestration at this point in time. I think there's a matter that defendant when the Court -- Defense Counsel, when there was a question as to how we were going to proceed on the motion to dismiss. I don't think that was on the record and I think it should be on the record at this point that that was gonna be handled at the close of proofs.

THE COURT: That's my understanding. Preliminary discussions are that this would be handled at the end of close of proofs. So I don't know if that will be today or tomorrow. I'm not here tomorrow, so we will be recessing and coming back on another day or let me look at my docket for the afternoon.

MR. HALL: I have a doctor's appointment this

afternoon, your Honor.

THE COURT: I didn't hear you. What?

MR. HALL: I have a doctor's appointment this afternoon.

THE COURT: Okay. All right, so you're not available to come back this afternoon.

MR. HALL: Correct.

THE COURT: All right.

MR. MUISE: And I do, your Honor, in our initial discussions about evidence, there's gonna be some issues with the body cam video, but my understanding is the prosecutor does not object to the admission of this, the public comment video of Mr. Hess.

THE COURT: Is that gonna be a stipulated joint exhibit?

MR. HALL: Your Honor, I would mark it as People's Exhibit Number 1 at this point. I would move for its admission. I don't believe there's any objection by Defense Counsel.

THE COURT: People's Number 1, which is a video of --

MR. HALL: Which is actually up on the screen right now.

THE COURT: I know. And can somebody give me date, time and place?

MR. HALL: So once we get into the testimony, your Honor, there will be reference to a date, that being December 15th, 2023, where there was a recount of an election. This was a statement purportedly made, which was made by the defendant during the recount.

THE COURT: Okay, all right. Thank you. And so we have a mutual order for sequestration. We have People's Number 1 that's been admitted. Any other exhibits admitted by stipulation or any facts for purposes of exam only?

(At 10:21 a.m., People's Exhibit Number 1, was identified and admitted by the Court.)

MR. HALL: No, your Honor, not at this time.

MR. MUISE: No, your Honor.

THE COURT: All right. People, call your first witness for me, please.

MR. HALL: If I may go retrieve that person, your Honor?

THE COURT: Yes. Good morning, sir. You're gonna head towards this brown chair.

MR. ROZELL: Okay.

THE COURT: It's very heavy, so you -- oh, thank you. Thank you so much. Sir, if you can raise your right hand for me.

You swear or affirm to tell the truth and nothing but the truth in this matter?

MR. ROZELL: I do.

THE COURT: Thank you. Upon being seated comfortably, please state and spell your first and last name for my court reporter, please.

THE WITNESS: Sure.

THE COURT: Thank you.

THE WITNESS: Joseph, J-o-s-e-p-h, Rozell, R-o-z-e-l-l.

THE COURT: Thank you. Your witness, Mr. Prosecutor.

MR. HALL: Thank you, your Honor.

JOSEPH ROZELL

(At 10:22 a.m., called as a witness by the People and sworn by the Court, testified as follows:)

DIRECT EXAMINATION

BY MR. HALL:

Q. Mr. Rozell, I want to take you back to December 15th of 2023. Did you have a job title at that point in time?

A. Yes.

Q. And what was that?

A. I'm the Director of Elections for Oakland County.

Q. Is that a appointed position or are you elected?

A. Appointed. I'm a civil servant.

Q. And how long have you held that position?

A. Since January of 2007.

Q. And since you're the Director of Election, is that a governmental unit?
A. Yes, it is.
Q. And what is it called?
A. Oakland County of Michigan.
Q. And it is the Election Division?
A. That's correct.
Q. And that is what you are the head of, correct?
A. Yes.
Q. So do you recall the date that I referenced, 12-15-2023?
A. I do.
Q. Do you recall what was going on that date?
A. Yes.
Q. Can you tell the Court?
A. We were conducting a recount for the City of Royal Oak, a charter amendment involving ranked-choice voting.
Q. So let's go back. So how does it happen that a recount occurs? I mean is it when it relates to a ballot, something like this, is it something that normally occurs or does somebody have to petition for it?
A. Under the law, it's required that an individual petition for this type of recount.
Q. And was a petition filed in this case?
A. It was.
Q. And do you know who filed it?

A. Yes.
Q. What is that person's name?
A. William Harrison.
Q. And I believe I cut you off. Was it a recount of one particular ballot issue?
A. That's correct.
Q. And what was that ballot?
A. It was a charter amendment issue in the City of Royal Oak related to ranked-choice voting.
Q. And once the petition is filed, what is it that you have to do as the Director of Elections?
A. So we are obligated to summon the Board of County Canvassers, which is a body of two republicans and two democrats that are nominated by the County political parties and appointed by the County Board of Commissioners. And that Board of County Canvassers is responsible for overseeing the conduct of that recount. So that's one of the steps that we take is to summon the board.

We also put the local clerks of the City Clerk for the City of Royal Oak who has custody of the ballot containers for that particular election on notice that those ballot containers will be required to be transported to where the recount is being conducted. And then there's a number of administrative procedures that we have to perform internally to prepare for the recount itself.

Q. When I referenced the date, 12-15-23, I'm assuming that is the day that was selected for the recount?
A. That's correct.
Q. And did the City of Royal Oak deliver the ballots to your office?
A. Yes, they did.
Q. And is that at the 1200 building in Oakland County?
A. Yes, it is.
Q. And, specifically, it's also in Pontiac, correct?
A. Yes, it is.
Q. Prior to conducting the recount, did you determine whether or not you should have any security, meaning deputies present for the recount?
A. Yes, I did.
Q. And what did you base that upon?
A. When we received the recount petition, typically a recount petition, it's a state form. It's a single-page document that's used. Attached to the recount petition were 18 additional pages that made allegations about voting equipment, not being certified, using voting equipment that was contrary to state law, allegations about absentee ballots that were mailed and never received by the City Clerk, things that are very atypical in a recount petition that our office receives.
And in a conversation that I had had with the state election director where I had mentioned this, he had indicated

that there was a similar petition filed in 2022 at the state level that contained similar allegations attached to the recount petition for Props 2 and Props 3, the constitutional amendments that appeared on that ballot in 2022. We were part of the conduct of that election. We had a part of the conduct of that recount -- I apologize.

And so we had security at that recount and there were issues at that recount, so that led me to believe that if this was going to be a repeat of what we experienced in 2022, that we needed to have security. Also, the environment that we are in now is different and we do rely on security for these types of things.

Q. What do you mean the environment is different?

A. Things have become pretty polarized, I would say. And, you know, we've -- we administered the largest absent voter counting board in the state at Oakland County where we count absentee ballots on behalf of a number of cities and townships in our County and we've had issues with challengers behaving badly at the absent voter counting board. So we've had security at those types of election activities as well.

Q. So the recount on Props 2 and 3, that was a state election, correct?

A. It was a state election.

Q. And I'm assuming that the recount occurred in your office as it relates to the Oakland County ballots?

A. So that is a state level recount, but it's obligated to be performed by the County Board of Canvassers under state direction. Because of the pier size of what was being requested in that particular recount, we used the Troy Community Center to conduct that recount. But, generally, they are conducted when we can in our office.

Q. So the Court is aware and I'm sure the Court is familiar with the building, where is your office located?

A. So we are located on -- you can enter our office, the easiest way is on the north side of the courthouse. We're in what's called the west wing extension. We're on the first floor, so there's sort of the original 1200 building, then there was a west wing addition and then the west wing extension which is sort of the newest tower of the County courthouse. And our office is located on the first floor.

THE COURT: First floor across from the blind, the library?

THE WITNESS: We are actually in that, what was that library. That's correct, Judge.

THE COURT: Thank you. Continue.

MR. HALL: Thank you, your Honor.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. So going back to security and your -- your feeling that you needed security, what measures did you take?

A. So we reached out. We had asked a staff member to reach out to the court's security office for the courthouse building and we formally made the request for security and they assigned two deputies to that detail.
Q. Do you recall what time the recount started?
A. I don't recall the exact --
Q. Would it be -- and it doesn't have to be exact time. Was it morning, afternoon?
A. I believe it was in the morning.
Q. And if you could briefly describe for the Court, when you walk in the doors into -- is it the Elections Division?
A. Correct.
Q. What would you see when you first walk in?
A. So when you walk into the Elections Division, immediately to the left is a counter where employees are seated that are waiting on the public. There is sort of a large lobby area and then there's a long hallway where there are employee offices to the right. And sort of in the middle of the office is a large, what we call training and canvassing room. That's where we train election workers, conduct recounts, conduct post-election certification, etcetera. So there's a large enclosed room sort of in the center of the office.
If you were in the lobby and you were go -- to go to the left, there's an area where there's a number of files. And then there's two subsequent rooms in the back where we

store poll books and we accumulate results on election night. There's where we store equipment that's used to program voting equipment, etcetera. And then there's another hallway that leads to a bathroom and a kitchen.

Q. The area where the recount occurred, where was that area?

A. That was in the enclosed canvassing training room. It's sort of in the center of the office in that enclosed room.

Q. Was the public allowed access to that room for the purpose of the recount?

A. Yes. The recount is a public process.

Q. And do people have to sign in before going into -- I mean the public, not you and other people that canvass. Do they have to sign a -- any type of sheet before entering the room?

A. We request that individuals sign in so we have noted for the record who has attended the recount.

Q. And as far as the people involved in the recount, are they segregated from the public, meaning are they -- is the public allowed to sit in the same area as the people performing the recount?

A. So if you're a member of the public, we have a designated public area that you can be seated in. So you're just a member of the public there to just observe in general. There are also what you could consider members of the public, but they're in a role of an observer, so they're there to perform an actual role and that is observe what's occurring at a

recount table.

Q. And were there seats for the people that were just there -- I mean not the people that are doing the observing, the civilians doing the observing, where they were supposed to sit?

A. We had seats for the public, yes.

Q. During the recount, were there two deputies present?

A. Initially --

Q. To start with?

A. Initially, yes.

Q. In uniform?

A. Yes.

Q. Are you familiar with a person known by the name of Andrew Hess?

A. Yes.

Q. Do you see him in the courtroom?

A. Yes.

Q. Could you identify where he's seated and what he's wearing for the Court.

A. He's seated at the table right there wearing a suit and a red tie.

Q. Is he smirking at you right now?

A. Sort of, yes.

MR. MUISE: Objection, your Honor.

THE COURT: I agree, argumentative.

Let the record reflect this witness has identified a one Andrew Hess. Thank you.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. Prior to December 15th, 2023, had you ever observed Mr. Hess before?

A. Can you repeat that? I'm sorry.

Q. Other than the date of December 23rd -- I mean December 15th, 2023, had you ever seen Mr. Hess before?

A. Yes.

Q. Where was that?

A. He was present at the Troy Community Center for the Prop 2, Prop 3 recounts.

Q. Were there a lot of people there?

A. At that recount?

Q. Yes.

A. Yes.

Q. And is there a reason that you can remember Mr. Hess being there?

A. Yes.

Q. Why is that?

A. He --

MR. MUISE: Objection, relevance.

THE COURT: I'm gonna allow it. I think it's very relevant if he's familiar with your client. Go head.

THE WITNESS: Thank you, Judge. Yes, he had -- he along with two other individuals asked to speak with me in a hall, in the hallway and in front of two sheriff's deputies requested that I be arrested for interfering with the conduct of the recount.

MR. MUISE: Objection, your Honor.

THE COURT: I'm gonna allow it. It shows a pattern of behavior between the two parties, between the witness and your client. I'm gonna allow it.

MR. MUISE: He's not --

THE COURT: I'm gonna allow it. Thank you.

MR. MUISE: May I have one additional objection, your Honor?

THE COURT: Yes, please.

MR. MUISE: He's not being prosecuted for anything that he said then.

THE COURT: No.

MR. MUISE: But if in terms of a prior bad act that he acted in propensity, that's a problem.

THE COURT: You said that. I said it shows a prior relationship. I never said bad act.

MR. MUISE: Well, as long as it's just admitted for the purposes --

THE COURT: I said -

MR. MUISE: of showing relationship ---

THE COURT: I said -- I said that the parties have a prior relationship or contacts. You want to say that I said bad acts. That did not come out of my mouth.

MR. MUISE: I understand, your Honor.

THE COURT: Do not mischaracterize what I said, sir.

MR. MUISE: I'm not trying --

THE COURT: Court would appreciate that.

MR. MUISE: I would -- I'm not trying to make this mischaracterized. I just want to make sure what purpose is it being admitted for.

THE COURT: Showing a prior contacts between --

MR. MUISE: Okay.

THE COURT: -- the parties. They have a prior relationship, tacit, close or distant. We'll leave that to the trier of fact. Continue, Mr. Hall.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. If you remember where you were, I think you were talking about that Mr. Hess wanted to speak to you and then you started to speak before there was an objection. So if you can go back to where you started and continue.

A. Sure. I was asked if I could go into the hallway, that these individuals wanted to speak with me, Mr. Hess along with two other individuals. And they wanted to see both sides of the ballot during the recount and we indicated that the proposals,

that being Prop 2 and Prop 3 were on the back of every ballot in the County and so that we were only required because we're only recounting Prop 2 and Prop 3, what's on the front of the ballot is not relevant to the recount. We're only required to examine the Prop 2 and Prop 3 questions. And that's when they demanded that the two sheriff's deputies have me arrested for interfering with the conduct of the recount.

Q. Did that end at that point in time?

A. It ended because I made it clear that I'm following state law and that there is no interference with the conduct of the recount. And the deputies, you know, took no action, so I went back into the room to carry out my duties.

Q. During the recount on 12-15-23, did you see Mr. Hess on that date?

A. Yes, I did.

Q. And when did you first notice Mr. Hess?

A. When he came into the room.

Q. Did he appear to be alone or did he appear to be with other people?

A. There was a group of people. He appeared to be with other people.

Q. Was he one of the petitioners on the recount?

A. No.

Q. Did he sign as one of the petitioners when he signed in?

A. I don't -- I don't recall how he signed in, but he was not

listed on the recount petition itself, no.

Q. Were there rules or indication as to how people were to conduct themself that were part of the public?

A. Yes. So at the beginning of every recount, we go through a process where we introduce who the Board of Canvassers are, who the individuals that will be assisting the board and the conduct of the recount are, who the County staff members are and what their responsibilities will be in the conduct of the recount, etcetera.

And then we -- we outline what the rules will be. Like if you -- example would be if you're an observer and you have bottled water, you're not gonna have your bottle of water on the table because you risk spilling it and potentially ruining ballots that then would be difficult to recount.

So we go through a number of rules like that involving conduct, etcetera, how to raise a challenge or an objection, etcetera. And so that process occurred at the beginning of this recount as it has every recount during my tenure in this job.

Q. Are people told that they're supposed to remain seated or are they free to move around, approach people?

A. Right. So if you're a member of the public, you're restricted to the public area. The individual observers that are assigned to a particular recount table are, are restricted to the table where they're observing. And then the candidate or

in this case, in the case of a ballot proposal, the petitioner requesting the recount and their legal counsel are given latitude to move around.

Q. Did anybody have to be cautioned in the group as this recount's going on?

A. Yes.

Q. And who cautioned them?

A. I did.

Q. Did the deputies get involved that were there as well?

A. Yes.

Q. What did they have to do?

A. They had to ask the folks to go back to the public area or, you know, remain seated as an observer at a recount table.

Q. I don't want to put words in your mouth and I'd rather you describe it, but was it a heated confrontation? I mean how would you describe it?

A. Well, no. I think initially it was -- it started out as a friendly reminder. I mean so to just understand, there's a number of recount tables positioned around the room. There's ballot containers being brought around the room. If -- if folks are just up wandering around, it's impeding our ability to efficiently conduct the recount.

So it's initially it's a reminder, hey, these were the rules we talked about. As a reminder, can folks remain seated or remain in the public area. But then as we move on

when folks aren't listening to what we're requesting, then it was okay, you know, folks we're gonna need you to do this. And then when it continued to occur, that's when the sheriff's deputies were asked to intervene.

Q. Were you the person that asked them to intervene?

A. Yes.

Q. Was there a point in time that you had direct contact with Mr. Hess?

A. Yes.

Q. Describe that to the Court.

A. Mr. Hess was seated at a table observing a recount team and a ballot container for a particular precinct was brought over to that team to begin the recount process.

THE COURT: Can we stop for a minute?

MR. HALL: Yes.

THE COURT: Earlier, the People elicited from its witnesses that there are official observers and then there's public.

MR. HALL: Yes.

THE COURT: So when we -- you never used the word official. The Court is using that word.

MR. HALL: Thank you.

THE COURT: May I query the witness?

MR. HALL: Yes.

THE COURT: So, sir, when you say they're observers

and then there's the public, are there persons appointed as official observers of the count?

THE WITNESS: Yes.

THE COURT: Okay. And that's through the County Board of Canvassers?

THE WITNESS: It actually would be from Mr. Harrison who was the petitioner. So he's allowed to designate observers on his behalf to be seated at the different tables because he couldn't, you know, possibly be able to see everything.

THE COURT: How many observers are appointed to be at these tables?

THE WITNESS: There -- they had -- they're allowed to have two and I believe -- I don't know that they had two at every table, but they can have two observers there.

THE COURT: Okay. So there's official observers and then what we can say, one could opine, unofficial observers, i-e-e-g (sic), the public?

THE WITNESS: That's correct.

THE COURT: All right. Continue, Mr. Hall.

MR. HALL: Thank you.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. So I think I was asking is there a point, come a point in time where you had official -- you had direct contact with Mr. Hess

and you were talking about a particular ballot and a particular table, ballot box and particular table.

A. Yes, 'cuz he -- he was serving as an observer seated at that table, not seated --

THE COURT: Stop.

THE WITNESS: -- in the public area, seated --

THE COURT: Okay. So this is my question. When you bring in Mr. Hess, had he had been selected as an official observer or was he a member of the general public?

THE WITNESS: He had been selected as an observer.

THE COURT: Thank you. Clarify it, thank you.

MR. HALL: Thank you.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. Back to the question.

A. Okay.

Q. Direct contact, describe what happened.

A. So when this ballot container for the City of Royal Oak was brought over to this particular recount team, one of the first things that they're required to do is inspect the ballot container itself to make sure that it's not broken, there's no holes in it where ballots could be added or removed from the container, so they do a physical inspection.

Then they make sure that the seal on the container was sealed correctly so that the door could not be opened to

the container without the seal being broken. Then what they're required to do is match the seal on the container itself against the number on the certificate, which is attached to the seal and the poll book. During that process of the seal inspection, Mr. Hess called me over to the recount team to ask a question.

Q. And what did he ask?

A. He said that on the ballot container certificate, the original seal that had been recorded had been crossed out with a single line and a new seal number had been recorded above it and was that a problem. And I indicated it was not a problem in that if the new seal that was recorded was what was on the container and it was what is recorded in the poll book, which has been in the County's possession since election night.

So there's a distinct chain of custody where we've had this poll book with this number in it since election night. The City Clerk has had the ballot container in their possession since election night, it's okay. He said, "I want to see the broken seal."

I said, "There's no requirement under statute that that broken seal be retained."

And he said something to the effect of well, you don't care. And I said, "It's not whether I care or not. It's what's in state law."

And so as law -- I mean it does happen that a seal

can be -- a ballot container can be sealed and then the election workers realize we forgot to put the spoiled ballot envelope inside or we forgot to put the unused ballots inside. So they have to break the seal to add those items and then reseal the container and they followed the appropriate process.

His response was, "Treason is going to look very good on you." And at that point, I walked away. There was no further discussion necessary. I explained the statute. I explained that what occurred was in compliance with state law and that the team was authorized to proceed with the recount of that precinct.

Q. You walked away. Does Mr. Hess stay in the spot at the table where he's observing at that point in time?

A. Yes.

Q. When is the next point where you recall Mr. Hess saying anything or doing anything?

A. There was a point where we had counsel. The Elections Division and the Board of Canvassers is represented by Corporation Counsel, the County's internal legal counsel and there was a representative of Corporation Counsel present at the recount. The representative from Corporation Counsel was behind a set of tables sort of at the front of the room and he said, "I want to go behind those set of tables."

And I said, "You're not authorized to be in that

area."

And he said, "Well, he gets to be over there."

And I said, "He's the board's legal counsel. He's functioning in a capacity just like I am or other members of my staff."

So he said, "Oh, I see. So he gets to be there, but I don't get to be there."

And I said, "Well, that's basically what I'm telling you, yes."

Q. Did that end the conversation at that point in time?

A. To the best of my recollection, that ended the conversation.

THE COURT: Mr. Hall, may I ask a question of the witness? As official observers, are they given a list of particular duties and what they can and cannot do or is that just an informal discussion at a meeting?

THE WITNESS: So we have posted on each recount team table what their responsibilities and what they are allowed to do and not to do. And then we also have some things posted on the wall, the various walls of the recount room as like what we call recount reminders that remind the public and members there what they can and cannot do.

THE COURT: Are official observers reminded before the count started where they are to -- where they can and cannot go and where they're to be positioned, a juxtapositions to the ballots? How are you -- how do you handle that?

THE WITNESS: Well, so we -- we have delineated with tape on the floor, you know, where the public area is. So we -- so that is a clearly delineated area for the public. The observers are instructed to remain, you know, seated at their recount table. I mean we didn't like specifically identify areas that were off limits, but we did say where they needed to be when they were in their capacity as an observer.

THE COURT: Official capacity.

THE WITNESS: Official, official capacity, correct.

THE COURT: Thank you.

THE WITNESS: You're welcome.

THE COURT: Thank you, Mr. Hall, thank you. Continue.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. And all Mr. Hess' official capacity was was at one specific table, correct?

A. Right.

Q. When you came in contact with Mr. Hess in these first two encounters, how would you describe his demeanor?

A. Well, I mean when someone tells me that treason's going to look good on me, I -- I didn't take that as a very friendly demeanor. I mean he definitely seemed agitated when I told him that we were going to move forward with the recount and that there was no statutory requirement that the broken seal

that had been crossed out on the certificate be retained.

Q. After the second encounter, do you recall where Mr. Hess went, after you told him he could not be in that area?

A. I don't recall.

Q. Was there a point in time they were allowed to make a public forum where people are allowed to make statements?

A. Yes.

Q. Was the recount done at that time or was it ongoing?

A. So the recount was done and because the Board of Canvassers is a public body, they are required to take public comment as part of their meeting and so public comment is at the end of the agenda. And so once the board had concluded the counting of the ballots and that portion was completed, they opened it up to public comment.

Q. Did Mr. Hess make a statement?

A. He did.

Q. Did other people of the public, whether they're in an official capacity or not, did they make statements?

A. Yes.

Q. Do you recall whether Mr. Hess was first, second or you have no recollection?

A. I don't recall the order of the speakers.

THE COURT: Can the two of you approach the bench, please, while he's handling that matter to get that. You're gonna be playing that now?

MR. HALL: I intend to; yes, your Honor.

THE COURT: Let's get started. You two approach, please. Gwen, we're gonna go off the record.

(At 10:54:11 a.m. to 10:54:13 a.m., bench conference on another case.)

THE COURT: Back on the record on the Andrew Hess matter, 240538-FY. We have People's Exhibit 1. Is it cued and ready to be played?

MR. HALL: Yes.

THE COURT: Okay. You may -- did you want to start it or did you want to do -- lay a foundation?

MR. HALL: I want to ask the witness some questions as to who's on the video just so there's a record of it.

THE COURT: Sir, if you want to turn around, if you can -- any way that's comfortable for you without causing your neck to hurt.

THE WITNESS: All right.

THE COURT: Did you want it to start playing or no?

MR. HALL: I don't.

THE COURT: You want to approach the screen so you can point out to him?

MR. HALL: I think I can just question him from here.

THE COURT: Okay. Go head, Mr. Hall.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:
Q. So, Mr. Rozell, you see a person with a baseball hat and a black shirt in the back upper left corner of the screen, correct?
A. I do, yes.
Q. Who is that?
A. That's Mr. Hess.
Q. Then you see various people. It looks like almost behind Mr. Hess sitting at a wall. Is that the public area?
A. Yes, it is.
Q. And then there's a lady in yellow, a white and black shirt. She's got a phone in her hand and the lady next to her and then there's a table. What is that area?
A. That's one of the recount tables.
MR. HALL: May I have it played at this point in time?
THE COURT: You may.
(At 10:55:23 a.m. to 10:56:32 a.m., video played.)
DIRECT EXAMINATION CONTINUING:
BY MR. HALL:
Q. So in that video when Mr. Hess was up by the table to the right, there were blue boxes. Are those ballot boxes?
A. Yes, they are.
Q. And then the table behind Mr. Hess when he was actually addressing the whole room, is that where the Canvassers were

sitting?
A. Correct.
Q. And where you were sitting?
A. Yes.
Q. And then Corporation Counsel, was it actually Solon Phillips who was there?
A. Aaron Thomas.
Q. He's Deputy Corp?
A. Deputy Corporation Counsel.
Q. So the video stops. I mean this is not from footage that is taken from inside the County building with the County's cameras, correct?
A. Not that I'm aware of.
Q. You don't have any cameras or recording capability inside the area where this is happening, correct?
A. That's correct.
Q. So this is something that's been provided by someone who was there?
A. I'm -- I guess, yes.
THE COURT: If he knows.
THE WITNESS: I mean I'm assuming it was done by someone that was there, yes. I don't know who, but sure.
DIRECT EXAMINATION CONTINUING:
BY MR. HALL:
Q. Correct.

A. Yeah.
Q. But it correctly demonstrates what happened at that point in time at the recount?
A. That is correct, yes, 100 percent.
Q. And then it abruptly stops at a point where a lady starts spouting something or another. Did you hear the end of it?
A. The end of the video?
Q. Yes.
A. I'd probably want to hear it again, if possible.

(At 10:58:01 a.m. to 10:58:25, video played.)

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. So you heard an unknown person say treason?
A. Yes.
Q. At that point in time, did the people that were inside the -- where the recount is happening, did they change how they were acting?
A. Well, a subsequent speaker had to be removed from the room, yes. I mean it -- it definitely insighted other folks to come up under public comment and -- and make similar statements to the point that the chair woman of the Board of Canvassers, Ms. Harston Spann, had requested that they be removed from the meeting.
Q. Was Mr. Hess one of the people that was removed or was it the -- if you recall?

A. I don't recall Mr. Hess being removed. It was a woman by the name of Lori Skibo that was removed.
Q. At some point in time after what we have is -- that we just played as People's Exhibit Number 1, did one of your employees come to you with and inform you of a statement that Mr. Hess had made?
A. It was actually a sheriff's deputy that had initially come to me to report a statement that Mr. Hess had made.
Q. Was -- were you made aware of that before or after People's Exhibit Number 1?
A. After.
Q. And what statement were you told?
MR. MUISE: Objection, hearsay.
MR. HALL: Judge, if it's a defendant's statement, it is not hearsay.
THE COURT: I agree. It's a party admission. It's a party admission. So admitted.
MR. MUISE: It's the deputy that said it, not Mr. Hess.
MR. HALL: Judge, there's -- within the court rules, Rules of Evidence --
THE COURT: It's a party admission. Overruled, continue.
MR. HALL: Thank you.
DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. What were you told?

A. The deputy came up to me and said, "Mr. Rozell, I'd like you -- I'd like to make you aware that an individual threatened your life out in the lobby."

Q. Did he tell you what the specific statement that was made?

A. He said that the individual said that he was going to hang me.

MR. MUISE: Same objection, your Honor.

THE COURT: Overruled.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. So that statement was made prior to the public comments?

A. No. That was --

Q. The statement that he would -- the hanging happened prior to --

A. Oh -- oh, yes.

Q. -- Mr. Hess making the statement on public comment, which is People's 1?

A. Yes, that's correct.

Q. And that's during the actual recount?

A. Yes.

Q. And the public comments is after the recount has ended?

A. That's correct.

Q. Did that statement intimidate you?

A. I was --

MR. MUISE: Objection, relevance.

THE COURT: It’s very relevant on how he felt, if he felt it was a threat or not. I’m gonna allow it.

MR. MUISE: If I --

THE COURT: Your objection is so noted. Overruled. Answer the question, sir.

THE WITNESS: Thank you, Judge. I was literally in shock. I -- I felt my heart drop, yeah. It was very intimidating and, and very scary because I had never experienced that in my professional career. It’s not what I signed up for. When I signed up to be County Election Director, I didn’t sign up to be threatened and have my life put at risk.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. Were there any actions that you took to make sure that anything could be done to make yourself feel safer?

A. The deputy indicated that he was going to be making a report. When I got into my vehicle at the end of the work day, I immediately called the police department in the jurisdiction where I live and asked -- so they have what they call like a vacation list where a homeowner goes on vacation, you can request that your address be put on a patrol list just to keep an eye on your house. I explained what had happened that day at work and asked if I could have my residence added to that

list. They said that would not be a problem and that they would put my house on routine patrol.

I also reached out to my alarm company and said that, you know, there's a process if my alarm goes off. You typically, you know, will call me and say is everything okay and ask for a passcode. And then I said, "If my alarm goes off, I want you to send the police. You call me later. I have received a threat. I am concerned." So the alarm company said, No problem. We will alter the monitoring procedures for --

MR. MUISE: Your Honor, I'm gonna object to relevance to all testimony regarding his reaction to the speech. It's not relevant. A speaker's reaction -- a listener's reaction to speak is not a relevant basis for regulating speech. It's a long line of cases. We cited them in our, in our motion to dismiss to you, your Honor. It's not relevant.

MR. HALL: Well, I do feel it could be relevant.

THE COURT: I already over -- I already stated that we wanted -- I wanted to know how he felt and he's just explaining that in very specific detail. Overruled. Continue, sir.

THE WITNESS: Thank you, your Honor. So the alarm company agreed to monitor the -- to alter the monitoring procedures for my residence if there was an alarm received.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. Do you think that Mr. Hess' statement will affect how you handle recounts in the future?

MR. MUISE: Objection. Calls for speculation.

MR. HALL: It's his job.

MR. MUISE: It's not relevant.

THE COURT: He either knows or he doesn't. Do you know?

THE WITNESS: Yes.

THE COURT: Okay. Answer the question.

THE WITNESS: Absolutely, it will alter how it -- how they're conducted in the future, absolutely.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. More security?

A. More security, yes.

MR. HALL: Nothing further at this time.

THE COURT: Thank you. Counsel, your cross-examination of the witness.

MR. MUISE: Thank you, your Honor.

THE COURT: Before we get started, can the two of you approach --

MR. HALL: Yes, your Honor.

THE COURT: -- on a non-related matter? Off the

record, Gwen.

(At 11:04:33 a.m. to 11:08:49 a.m., off the record.)

THE COURT: All right. You want to go ahead and cue up the video? Did you need the video again, Counsel?

MR. MUISE: I won't, unless he needs to refresh his recollection.

THE COURT: No, I didn't know if you needed it cued up again.

MR. MUISE: I do not.

THE COURT: Okay, go head.

MR. MUISE: Not necessarily.

THE COURT: No, that's fine. Go head, sir.

CROSS-EXAMINATION

BY MR. MUISE:

Q. Good morning, Mr. Rozell. I'm Robert Muise. I represent the defendant in this case, Mr. Hess. You and I -- you and I have never met before this, have we?

A. We have not, to my knowledge.

Q. Sir, Mr. Hess never told you directly that he was going to hang you, correct?

A. Correct.

Q. So those words were never personally communicated to you by Mr. Hess at any time?

A. Correct.

Q. Mr. Hess never communicated to you the words, quote, "Hang Joe

for treason," correct?

A. Correct.

Q. These words, "Hang Joe for treason," are what Ms. Howard claims she overheard Mr. Hess stating in the lobby. Are you aware of that?

A. Yes.

Q. And you were not in the lobby to hear the words, quote, "Hang Joe for treason" that were allegedly uttered by Mr. Hess; is that correct?

A. I was not in the lobby.

Q. And at no time in the election recount room with you and the other election officials did Mr. Hess state, quote, "Hang Joe for treason;" is that correct?

A. Not that I recall, correct.

Q. Okay. At no time in the election recount room with you and the other election officials did Mr. Hess state, quote, "I'm going to hang Joe Rozell," end quote, correct?

A. Correct.

Q. At no time while in the election recount room with you and the other election officials did Mr. Hess state that he was going to hang anyone?

A. Not that I heard.

Q. And as far as you know, no election official involved in the recount was in the lobby at the time that Ms. Howard alleges to have overheard Mr. Hess say hang Joe for treason?

MR. HALL: Judge, I don't think there's any foundation for him to answer that question.

MR. MUISE: I asked as far as he knows, if he has any personal knowledge. That'd be --

THE COURT: Well, he said he wasn't in the lobby, so you want to rephrase the question?

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Sir, do you have any information?

THE COURT: Well, how about this. Were you in the lobby at all?

THE WITNESS: Not during the recount, no.

THE COURT: And when the deputies informed you, allegedly, of what Mr. Hess said, did they tell you anyone else was present?

THE WITNESS: I don't recall.

THE COURT: Thank you. Counsel, move on.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Sir, are you aware if there were other than Ms. Howard, any other coworkers from the County that were present in the lobby when Ms. Howard overheard the statement?

MR. HALL: Same objection, your Honor.

THE COURT: Counsel, I think you've asked and answered that question. Let's -- we're going to move on.

MR. MUISE: I asked about if the coworkers had any information about that.

THE COURT: Counsel, I'm gonna ask you again to move on to your next question. Asked and answered.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Did any coworker other than Ms. Howard ever tell you that they overheard Mr. Hess making any statements to the effect that he was gonna hang you?

A. There were two coworkers who were seated just inside the door that had indicated they had overheard conversations between Mr. Hess and the deputy, but I don't recall exactly specifically what that was.

Q. But that was after in your understanding of the timeline based on your testimony, that that -- when the deputies spoke with Mr. Hess, it was after Mrs. Howard told the deputies about this alleged threat, correct?

A. I would assume so.

Q. Sir, you gave a statement to the Oakland County Sheriff's Office regarding this matter, correct?

A. Yes.

Q. It was typed out?

A. Yes.

Q. Did you type it?

A. Yes.

Q. Did anybody assist you with making this statement?
A. No.
Q. Do you recall the statement being made on January 9th of 2024?
A. That seems about the time.
Q. So it wasn't actually on the -- on December 15th of 2023 that you actually spoke with any of the County sheriffs, is that right?
A. No. I spoke with County sheriffs on that day. I mentioned that earlier.
Q. Right, I stand corrected. You didn't give any, any statement to them, correct?
A. I -- something went off and I did not hear what you said. Can you repeat the question?
Q. I want to clarify you didn't give them any written statement about what happened on December 15th, 2023 to the deputies on that date?
A. On that date, no, I did not.
Q. In your statement, you said Andrew Hess --

MR. HALL: Judge, I'm gonna object to him reading the statement into the record.

THE COURT: Is this a statement from a police report, sir, which is the basis of hearsay?

MR. MUISE: It's a --

THE COURT: You know, police -

MR. MUISE: It's a signed statement by him, your

Honor.

THE COURT: Make your objection, Mr. Hall.

MR. HALL: Judge, I don't think it's proper to read the statement into the record. It has not been admitted. He can question him as to whether or not he remembers making a statement for the purpose of impeachment. Otherwise, it's not admissible hearsay.

THE COURT: I agree. An extrinsic impeachment, sir, the threshold is about this wide. You can't use extrinsic documents or statements for impeachment purposes. Thank you.

MR. MUISE: Your Honor, this is a statement of this witness, signed by this witness.

THE COURT: You want to ask him if he made a statement and what he recalls and what he doesn't recall, but you cannot extrinsically read it into the record.

MR. MUISE: And I was gonna ask him if that statement is correct.

THE COURT: You may.

MR. MUISE: That was -- and that was the statement I was gonna read to ask him --

THE COURT: You can't do -

MR. MUISE: -- if it's correct.

THE COURT: You can't do it via reading, sir. You want to ask him --

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Mr. Rozell, was every -- was everything that in your statement you made to the police on -- to the deputies on January 9th, 2024, was the information in there correct?

A. To the best of my knowledge, yes.

Q. And this statement that you alleged Mr. Hess threatened you with was not the statement that Ms. Howard actually said she overheard; isn't that correct?

A. I'm not sure -- I don't know what you're asking me.

MR. MUISE: May I approach the witness and show him his statement to refresh his recollection, your Honor?

THE COURT: You may. You may approach.

MR. MUISE: And I'll mark this for identification purposes, Defendant's Exhibit A.

THE COURT: Sir, I'm gonna ask you to read it to yourself. Let the Court know when you have refreshed your recollection.

THE WITNESS: Okay. Thank you, Judge.

THE COURT: If it did or did not. Thank you.

(Defense Exhibit A, was identified.)

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. And I direct your attention to what you put in as the quote, "As the alleged threat."

MR. HALL: Can you reference the line?

THE COURT: Sir?

MR. MUISE: Yes.

THE COURT: One moment, please. I want to give him an opportunity to read it and to refresh his recollection. Do not interrupt that process, please, sir.

THE WITNESS: Okay. I read the statement.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. The quote you have in there, the alleged threat is not --

THE COURT: Okay. Turn over the statement, sir. Turn it over.

THE WITNESS: Okay.

THE COURT: Now, you can ask him if he remembers.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Do you remember if the statement you allege where you wrote in your statement was different from what the alleged threat that Ms. Howard overheard?

A. No. To my knowledge, it's the same statement.

Q. Did you ever talk to Ms. Howard about what you actually heard?

A. I believe I spoke with the sheriff's deputy about it. I don't recall if I -- I may have spoken specifically with Ms. Howard about it. I don't -- I don't recall exactly.

Q. Did you see what Ms. Howard actually wrote in her signed statement to the deputies as to what the alleged threat was?

A. I don't recall seeing a signed statement from her.
Q. The point is -- well, strike that.
You have no personal knowledge what was actually stated in the lobby because you weren't present, correct, sir?
A. Correct.
Q. You mentioned that the December 15th 2023 recount was, was contentious, I guess would be a way of describing it?
A. The 2023 recount?
Q. December 15th, 2023.
A. Yeah. It did become contentious, yes.
Q. There were private citizens who were upset with the way things were going?
A. Yes.
Q. You were responsible for oversight of the conduct of that recount, correct?
A. Yeah, under the direction of the Board of County Canvassers, that's correct.
Q. And there were multiple challenges that were submitted by private citizens to the way in which the recount was being handled?
THE COURT: What was that -- excuse me. What was that question again, sir?
MR. MUISE: There were multiple challenges submitted by private citizens to the way in which the recount was being handled.

THE COURT: What date? You're talking about for this particular recount?

MR. MUISE: This recount, yes, your Honor.

THE COURT: Okay.

MR. MUISE: December 15th, 2023.

THE COURT: Do you know if there were any complaints?

THE WITNESS: So there --

MR. MUISE: And, just to be correct, I said challenges, not complaints.

THE COURT: Challenges to -- you mean prior to the recount or after the recount?

MR. MUISE: During the recount process.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. And I believe you testified that the -- there was a process for making challenges to how things were going on that day.

THE COURT: Okay, all right. So were there any challenges during the recount process?

THE WITNESS: So after the ballots were all tabulated, there were a number of ballots projected on a screen where a voter may have attempted to correct a ballot where they maybe voted yes, but then put an X through it and marked the no box and said, you know, this is my choice. So those ballots were projected and individuals, Mr. Harrison,

were given an opportunity to challenge the board's interpretation of that. I -- there may have been one or two of those specific statutory challenges.

Then there were a number of challenges after that process concluded that were submitted in writing. And, to my knowledge, those challenges were ruled on by the board, but really outside the scope of what a recount is and how the recount is conducted. But they did, nonetheless, submit written challenges, yes.

MR. MUISE: May I approach the witness, your Honor?

THE COURT: With what?

MR. MUISE: Defendant's Exhibit B.

MR. HALL: Your Honor --

THE COURT: Have you showed that to, to the prosecution first?

MR. HALL: I'm gonna object. It is a statement signed by two people who are not -- one is not here.

THE COURT: Okay, let's approach. First of all, approach, please. Off the record, Gwen.

(At 11:21:19 a.m. to 11:21:41 a.m., bench conference.)

MR. MUISE: So may I approach the witness, your Honor?

THE COURT: No, you may not. Ask the question first. Back on the record, Gwen.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Sir, did you receive any of these written challenges to the procedures of the recount on December 15th, 2023?

A. Some were handed to me and passed directly to the board. Some were handed to the board directly. So --

THE COURT: So what's the process if there's a written request? Does it go from you or from another agent and then to the Board of Canvassers?

THE WITNESS: It can. Sometimes that is what happens. Sometimes it's handed directly to the board. I mean if the individual approached and handed the challenge directly to the board, I may not have seen it.

THE COURT: Okay. And on that particular date and time if there were any written challenges what, if anything, would you -- did you do, if you recall, and what's the procedure?

THE WITNESS: So I would pass the challenge to the board to have the board chair person read the challenge and then the four board members would render a decision on that challenge.

THE COURT: Okay. So you don't review it and make any decisions to it?

THE WITNESS: I am not a decision maker in that process, no.

THE COURT: Okay. Your next question.

MR. MUISE: I wanted to see if this is one of the challenges he received.

THE COURT: He said he doesn't read them. You want to ask? You never asked him the question did he receive one from Mr. Hess, first of all. You never asked him that.

MR. MUISE: I asked a preliminary question, which you indicated whether he actually would receive the challenges.

THE COURT: Challenges.

MR. MUISE: Right.

THE COURT: Now you want a specific challenge --

MR. MUISE: That's right.

THE COURT: -- to be identified.

MR. MUISE: And --

THE COURT: Ask him.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Did you receive a challenge that was signed by Mr. Hess?

A. I don't recall.

THE COURT: Thank you. Next question.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. You testified previously about Mr. Hess making some complaints to you about the seals on the -- on the ballot boxes being

broken, correct?

A. Correct.

Q. There were apparently three seal numbers on a green card in one of the -- one of the ballot boxes?

A. I just want to clarify that it wasn't that the seal was broken. It was that the seal number on the certificate had been crossed out and a new number had been entered. So it wasn't that the container arrived with a broken seal. I want to be clear on that, that the seal had been broken at some point during election day and then resealed.

Q. And the seal was not in the bag, though, correct?

A. Not to my knowledge.

Q. All right. And is there not a state law requiring you to maintain election materials for 22 months?

MR. HALL: Judge --

THE COURT: We're going to --

MR. HALL: I'm gonna object as to -

THE COURT: -- not get into any legal questions regarding that, sir. Next question, sir. Sustained.

MR. HALL: And I also object that it's not relevant.

THE COURT: It is not relevant and this -- you're calling for a legal conclusion. Let's move on, sir.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. One of the other complaints that Mr. Hess made was that there

was no initials on one of these crossed off signatures on this, on the tags, correct?
A. I don't recall.
Q. Well, you do recall, I believe you testified to a conversation you had with Mr. Hess regarding a chain of what he believed to be a chain of custody issue with the ballots regarding these seals, correct?
A. Correct, we did have a conversation and I tried to assure him, assure him of the chain of custody of that, yes.
Q. You referenced a contact with Mr. Hess with the Prop 2 and Prop 3 ballot recounts, correct?
A. Correct.
Q. And at that -- during that ballot recount, he accused you of a crime, is that right?
A. By interfering with the conduct of a recount, correct.
Q. And deputy sheriffs didn't arrest you or take any further action?
A. They did not.
Q. When Mr. Hess made the statement that you allege, quote, "Treason is going to be -- is going to look good on you," end quote, do you remember making that allegation?
A. Do I remember --
Q. You testified that Mr. Hess said to you, quote, "Treason is going to look good on you," end quote, correct?
A. Yes.

Q. Yes?
A. Yes.
Q. Did you bring that to the attention of any of the deputies that were there?
A. Not that I recall. I mean they may have been within earshot of it. They may have heard it. I don't recall. But I didn't go up and make a statement of mine.
Q. Okay. So you weren't overly concerned about that statement to the point where you asked the deputies to either arrest Mr. Hess or escort him out, correct?
A. Correct.
Q. And you observed, you saw his public comment. We saw that on the video, People's Exhibit 1. You observed that. You were present during that, correct?
A. Correct.
Q. And no time during that public statement did you request the deputies to either arrest or take Mr. Hess into custody, correct?
A. Well, I -- the chair woman over the Board of County Canvassers ultimately would be the one that would make that decision.
Q. Okay. But --
A. So I mean -- sorry. We -- so I --
Q All right. That might be with her ultimate decision, but you personally did not request the deputy sheriffs to go arrest or detain Mr. Hess based on anything he said in the public

comments?

A. No.

MR. MUISE: I got two more exhibits I'm gonna mark as Defendant's Exhibits C and D. I know B wasn't admitted, but to stay in sequence. May I approach the witness, your Honor?

THE COURT: Yes, you may. What is it? Have you reviewed it?

MR. MUISE: They're snapshots from --

THE COURT: Okay.

MR. MUISE: -- the public.

THE COURT: Go head, you may approach.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Sir, I'm handing you what's been marked as Defendant's Exhibit C.

A. All right.

Q. And that's Exhibit D. Look at those.

A. All right.

Q. Those are screenshots from the video that you just watched, People's Exhibit 1, with Mr. Hess giving his public comments?

(Defense Exhibits C and D, were identified.)

MR. HALL: I'd ask, Judge, I'd rather that the witness not answer that question, but for the purpose of exam, if Defense Counsel's indicating that both C and D are still

shots taken by someone, that he's representing that they are the still shots, I do not have any objection to their admissibility.

THE COURT: Okay, so admitted.

(At 11:28 a.m., Defense Exhibits C and D, were admitted by the Court.)

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. And this appears to be screenshots taken or photographs taken either from video or otherwise of Mr. Hess making his public comment that you saw in the video, correct?

A. Appears to be.

Q. And the two deputies in the back, are those the deputies that were stationed there for security?

A. Yes. They were there for security, yes.

Q. And if you look at Defendant's Exhibit C, that appears to be from what you watched on the video the time when Mr. Hess was departing the room, correct?

A. Can you --

MR. HALL: Judge, I don't like comments appears to be. I mean I would --

THE COURT: Yeah. I need -

MR. HALL: -- stipulate that --

THE COURT: The photo speaks for itself.

MR. HALL: Yes.

THE COURT: We're gonna move on, Counsel.

MR. MUISE: Okay.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. So even after his statement that he gave, the public statement he gave, we have two deputies standing in the back with their arms crossed just watching, correct?

THE COURT: Well, the photo doesn't say that. The photo shows deputies, but if you want to ask him if it recollects what they did and did not do? The photo cannot speak to that.

MR. HALL: I believe --

THE COURT: It's a still shot.

MR. MUISE: The still shot shows the deputies with their arms crossed, your Honor.

THE COURT: Well, fine, say that.

MR. MUISE: That -- that's what I did say.

MR. HALL: Well, I think the Court –

THE COURT: But anything beyond that -- anything beyond that, sir, the photo speaks for itself. Mr. Hall, did you want to further comment on that?

MR. HALL: I was concurring with the Court. That was gonna be my objection. You have an exhibit. It speaks for itself.

THE COURT: Speaks for itself. Let's move on,

Counsel. It's 11:30 and I promised the other attorneys that we would get to their matters.

MR. MUISE: Thank you.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. None of the deputy sheriffs took any action against Mr. Hess following his public comment, correct?

A. I have -- I don't -- I have no idea what they did or didn't do.

Q. Let me phrase it this way. While you were in the recount room watching Mr. Hess give his public comment, you observed him give the comment and walk out the room, correct?

A. Correct.

Q. At any time when you were observing him, did you see any of the deputy sheriffs take any action towards him, whether detaining him or arresting him?

A. I mean I couldn't see what was occurring outside of the room.

Q. I understand.

A. So I can only say what I saw specifically in the room. I did not see it occur in the room.

Q. Okay. So you did not see any such action taken by the deputies against Mr. Hess in the recount room?

A. Correct.

Q. There were no arrests made at the recount at any time, correct?

A. I have no idea. I don't know --
Q. Did you -
THE COURT: Counsel, can you clarify that, because this has been asked and answered. You asked did it happen inside the County room. How many times are you gonna ask this?
MR. HALL: Judge, the deputies are here --
THE COURT: Yeah. You can -
MR. HALL: -- to testify to that.
THE COURT: - ask that question of the deputies. Let's move on. It is 11:32. Let's move on.
CROSS-EXAMINATION CONTINUING:
BY MR. MUISE:
Q. Sir, and based on my recollection of your testimony, it's your understanding that the alleged terrorist threat was made by Mr. Hess in the lobby prior to coming back into that public comment period of time where he gave that speech you watched on People's Exhibit 1. Is that your understanding of the sequence?
A. That's my understanding.
Q. And he didn't come into the room in handcuffs or shackles or anything, correct?
THE COURT: Sir, I'm gonna ask you -- do not answer that question. Move on, Counsel.
CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:
Q. Sir, now on December 15th, 2023, did you ever see anyone including Mr. Hess be in possession of any ropes?
A. Not that I recall.
Q. Did you ever see anyone including Mr. Hess in possession of a noose?
A. Not that I recall.
Q. Did you at any time on December 15th of 2023, see anybody erect any gallows on the property of the circuit court?
A. I didn't recall seeing any of that, no.
Q. From December 15th of 2023 until today, you sitting here, has anybody attempted to hang you?
MR. HALL: Judge, I would object as to relevance for this proceeding.
THE COURT: I agree, sustained. Let's move on, Counsel.
CROSS-EXAMINATION CONTINUING:
BY MR. MUISE:
Q. You testified that because of your fear, when you left the recount, you drove home and you called your local police department, correct?
A. No. I called them before I left the parking lot at the courthouse.
Q. Okay. So you're in the parking lot of the courthouse. Did you ask the deputies to escort you out to your car?

A. No, but where I park is visible from a court deputy that is stationed inside the building.
Q. Did you ever ask the deputies to detain Mr. Hess?
A. No.
Q. You completed the recount as planned, correct?
A. Yes.
Q. Nothing stopped the recount from being completed?
A. No.
Q. Now, despite your alleged concerns about safety, that hasn't stopped you from doing media interviews about this case, correct?
MR. HALL: Judge, I'm gonna object as to relevance. What's the media --
THE COURT: Yeah. Relevance, Counsel?
MR. MUISE: Your Honor, it goes to undermine his claim that he's, you know, has this huge fear. He's going out and publicly, going on television and doing media reports, media stories of this case.
THE COURT: I'm not sure how that has a connection as to the probable cause hearing. I'm gonna sustain.
CROSS-EXAMINATION CONTINUING:
BY MR. MUISE:
Q. Do you know the Oakland County Prosecutor, Karen McDonald?
A. Yes.
Q. Do you know her personally?

MR. HALL: I'm gonna object to the relevance again.

THE WITNESS: Work. I mean we both --

THE COURT: Hold on. Hold, sir, don't answer. Relevance, Counsel?

MR. MUISE: Your Honor, I'm gonna -- I'm gonna explore conversations he may have had with Ms. McDonald about this, this case.

MR. HALL: That's a different question.

THE COURT: That's a different question. You want to ask that question?

MR. MUISE: I will. I was first gonna inquire --

THE COURT: No, ask -- no, ask that question.

MR. MUISE: Okay.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Have you ever had any conversations with Ms. McDonald about this case?

A. Yes.

Q. How many?

A. One.

Q. When was that?

A. I don't recall. It was after December 15th, but I don't recall.

Q. Do you recall what was, what was discussed during that conversation?

MR. HALL: Judge, unless there's some foundation, I'm gonna object as to relevance.

THE COURT: I agree, sustained.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Sir, since this alleged terrorist threat on December 15th of 2023, have you been in hiding at all?

A. No.

Q. Have you hired personal security?

A. No, but I have a Concealed Pistol License and I have began carrying a concealed pistol outside of work. I'm prohibited from carrying it, obviously.

Q. And you go to work every day as usual?

A. No. I -- I'm on a hybrid work schedule. Some days I work from my home and some days I go to work.

THE COURT: Can we refrain from personal questions, since we're talking about his personal safety. I'm gonna caution Counsel. We're getting into some very personal information about this witness here. For witness protection and safety, I'm gonna ask you to stay away from what his schedule is, what he's doing and what he's not doing and let's move on to the more relevant matters.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. You're still performing your duties as an election official

with the County this day, correct?

THE COURT: That's been asked and answered. Let's move on, Counsel.

MR. MUISE: No further questions, your Honor.

THE COURT: Mr. Hall, we're gonna pause your matter so I can get my other attorneys off, take a -- we're gonna take a break on your matter. Are you done with this witness?

MR. HALL: I just had one question.

THE COURT: Do your one question. Redirect for Mr. Hall.

REDIRECT EXAMINATION

BY MR. HALL:

Q. This ballot, the recount, was for the City of Royal Oak?

A. That's correct. It was only applicable to the City of Royal Oak.

Q. Are you aware of whether or not Mr. Hess is even a resident of Royal Oak, any connection to Royal Oak?

MR. MUISE: Objection, relevance.

THE COURT: If he knows. Do you know?

THE WITNESS: I do, and he's not a resident of Royal Okay.

THE COURT: Thank you. Next question.

MR. HALL: That's it.

THE COURT: All right. We're gonna take a pause. Sir, you're thanked and excused. Can you give those exhibits

--

MR. HALL: I don't know.

THE COURT: You can leave those exhibits there.

MR. HALL: Did you have any follow up on that question?

MR. MUISE: Sorry?

MR. HALL: Did you have any follow up on the question I asked?

THE COURT: Not now. It's gonna have to wait.

MR. HALL: I was just asking. I was gonna have him excused.

THE COURT: Okay. You have any follow up on that question?

MR. MUISE: No.

THE COURT: Okay. Witness is thanked and excused. Bailiff, can you make sure those exhibits are returned back to the right attorney. We're gonna pause on the Hess matter.

(At 11:38 a.m., witness excused.)

(At 11:38:39 a.m. to 11:59:23 a.m., off the record.)

THE COURT: Mr. Hall, I believe that the prosecution, you had one civilian witness left.

MR. HALL: Yes. If I may retrieve her, your Honor?

THE COURT: Yes, you may.

MR. MUISE: If I may, your Honor, before we just as a housekeeping, I just want to make sure the Exhibits C and D

were admitted. Those are the photos.

THE COURT: C and D was admitted and the A and B --

MR. MUISE: Right. A and B -

THE COURT: -- were not.

MR. MUISE: - were just marked for ident --

THE COURT: Yeah, for ident, but they were not admitted, yes.

MR. MUISE: Right, okay. Thank you.

THE COURT: All right. Ma'am, you swear or affirm to tell the truth and nothing but the truth in this matter?

MS. HOWARD: I do.

THE COURT: Thank you. Please be seated. And I'm gonna ask you to speak as if you're outside at a picnic and you're trying to get the whole party at the table to hear you.

THE WITNESS: Okay.

THE COURT: My court reporter will be typing down everything that you're saying, so we need you to speak loudly.

THE WITNESS: Okay.

THE COURT: All right. State and spell your first and last name for the record for me, please.

THE WITNESS: My first name is Kaitlyn, K-a-i-t-l-y-n. My last name is Howard, H-o-w-a-r-d.

THE COURT: Mr. Hall, your witness.

MR. HALL: Thank you, your Honor.

KAITLYN HOWARD

(At 12:00 p.m., called as a witness by the People and sworn by the Court, testified as follows:)

DIRECT EXAMINATION

BY MR. HALL:

Q. Ms. Howard, I'm gonna direct your attention back to December 15th, 2023. Were you working that day?
A. I was.
Q. And where were you working?
A. I was working at the Elections Division in the 1200 court building at the front desk.
Q. And your supervisor is Mr. Rozell?
A. He's my director. My supervisor is Heather.
Q. What's her last name?
A. Kadulski.
Q. Can you spell it?
A. K-a-d-u-l-s-k-i.
Q. And I'm not asking you where you work at this point in time, but you no longer work the same job, correct?
A. Correct.
Q. On the date in question that I've indicated, that being December 15th, 2023, was there a recount going on?
A. Yes.
Q. And did you have any part in the recount or were you just there?
A. I was just there. I was not in the recount room.

Q. So Mr. Rozell testified that as you enter the Elections Division room, there's a desk to the left; is that correct?
A. Correct.
Q. And you made a statement, I believe it's approximately five lines long about what you had heard and saw, correct?
A. Correct.
Q. And you indicate that a person made a statement, "Hang Joe for treason."
A. Correct.
Q. Do you see that person in the courtroom?
A. Yes.
Q. Could you identify him, please, what he's wearing.
A. Black suit, red tie, blue undershirt.
THE COURT: Let the record reflect that this witness has identified a one Andrew Hess in this matter.
DIRECT EXAMINATION CONTINUING:
BY MR. HALL:
Q. Prior to that statement being made, had you seen Mr. Hess?
A. Occasionally walking in, in through the office lobby area into the training room where the recount was held.
Q. So where the desk is, kind of a reception area for people coming in if they have any questions, correct?
A. Yes.
Q. And from there, you have a clear line of sight of the doors are open into where the recount was happening?

A. Yes.
Q. And I'm assuming that you were not paying attention to what was going on in the recount?
A. Nope.
Q. Is that no?
A. No. Yeah, sorry.
Q. Thank you.
So when you see Mr. Hess, is he in the area where the recount's occurring or is he exited? I know the doors aren't closed, but does he exit the area where the recount happens or is he coming out? I don't know.
A. During the time I heard --
Q. Yes.
A. -- what I said? He walking out of the room where the recount was happening.
Q. And when I said he made the statement, meaning Mr. Hess, "Hang Joe for treason," that is what you heard, correct?
A. Correct.
Q. That is what you wrote in quotes, correct?
A. Correct.
Q. The statement that you made, the written statement, you've seen it today, correct?
A. Correct.
Q. Did you make that the same day?
A. Yes.

Q. And when the statement was made, "Hang Joe for treason," was Mr. Hess still in the room, the recount room, coming out of it or had he fully exited the recount room, if you recall?
A. He was fully out of the room.
Q. Was he with anybody else?
A. There was another man in the lobby with curly hair. I --
Q. You wrote -
A. -- think I know his name, but I'm not entirely sure if that was him.
Q. Even if you guess, if we have it on the record.
A. I think it's Braden Giobachi (phonetic). I'm not entirely sure how to pronounce the last name.
Q. And where did you get that name from?
A. Someone that is calling the office asking questions, emailing relatively often. It's just a name you start to remember.
Q. So you're saying in your capacity as working in the Elections Division, there had been contact with the Braden, however you pronounce the last name, Gio --
A. Prior contact, yes.
Q. Okay. Did you see where Braden, we'll use that name, came from or the person with the curly hair came from?
A. He was already out there. He had brought --
Q. When you say out there, he's outside the -- where the recount is happening?
A. Yes. He was out in the lobby area already of our office.

Q. And besides yourself, the male with the curly hair you refer to as Braden and Mr. Hess, is there anybody else around?
A. I don't -- I don't recall anyone else being out there.
Q. When the statement was made, how far away do you think Mr. Hess was from you? And I don't want to -- you to speculate. I mean I know how far the distance is from the -- where you are and I'm assuming you were behind the counter?
A. Yes.
Q. And how far do you think the doors are away?
A. The doors to the training room where the recount was happening?
Q. Yes. Farther than --
A. Probably from me to you.
Q. Okay.
A. It's not that far.
MR. HALL: Not good with distances. Ten to fifteen feet?
MR. MUISE: I can pace it, if you like.
MR. HALL: It doesn't make a difference to me. I mean --
MR. MUISE: It's closer to 15, 20.
MR. HALL: Okay, that's fine. I'll accept that.
DIRECT EXAMINATION CONTINUING:
BY MR. HALL:
Q. Could you clearly hear Mr. Hess make the statement?

A. Yes.
Q. Was it louder than I am talking right now?
A. Without the glass in front of me, it was probably about the same.
Q. After the statement --
MR. MUISE: Your Honor, if the record reflect that this was the tone or the volume of his, of his questioning to her was conversational tone. He says the same as -- you don't know on the record, unless he could've been yelling, but he wasn't. He just asked her the question.
THE COURT: You'll have cross-examination you can determine that. Continue.
MR. MUISE: I just want to make the record -- okay.
THE COURT: Overruled, continue.
MR. HALL: I'd stipulate that it was a normal conversational tone.
THE COURT: Thank you.
MR. MUISE: Thank you.
DIRECT EXAMINATION CONTINUING:
BY MR. HALL:
Q. And the person that you refer to as Brandon (sic) with the curly hair, you said he was present when the statement was made?
A. Correct.
Q. Did he immediately say something to you --

MR. MUISE: Objection, hearsay.

MR. HALL: Can I finish?

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. Did he immediately say something to Mr. Hess?

MR. MUISE: Objection, hearsay.

THE COURT: He said did he say something, didn't ask what he said.

MR. MUISE: Okay.

THE COURT: Did you hear him say anything, yes or no?

THE WITNESS: Yes.

THE COURT: Thank you. Mr. Hall, next question.

MR. HALL: Your Honor, I believe it'd be under 803.1. It would be a present sense impression after he -- something startling is made such as "Hang Joe for treason." If there's an immediate statement thereafter, it would be a presence sense impression.

THE COURT: To this witness, are you asking her what was her impression of what was said?

MR. HALL: I'm asking her what was said because the present sense impression is the response to Mr. Hess saying, "Hang Joe for treason," and immediate response would be a present sense impression.

THE COURT: Ma'am, did you hear what was said?

THE WITNESS: Yes.

THE COURT: Okay. I'm gonna allow it for purposes of exam.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. What did you hear him say?

MR. MUISE: My hearsay objection continues, your Honor.

THE COURT: So noted.

DIRECT EXAMINATION CONTINUING:

BY MR. HALL:

Q. What did you hear him say?

A. He turned his head and said, "That's too much."

Q. And who was he directing that to?

A. He was directing that to Mr. Hess.

Q. And same question as before. When you had the statement that you attributed in your written statement to Mr. Hess, you wrote in quotes, "That's too much," as well, correct?

A. Correct.

Q. So there's no doubt in your mind those were the statements that were made?

A. Those were the statements.

Q. After hearing the statement and the response, what did you do?

A. Immediately, not much. I mean I couldn't leave my position at the front desk. I was the only one guarding it, so I had to

wait a little bit until I was able to go out into the lobby and find a deputy or someone I could report what I had heard to without disrupting the recount.
Q. Did you -- I didn't hear the last part. You trailed off. Without distracting the recount?
A. Without -- without disrupting the recount.
Q. You probably don't know the name of the deputy you talked to, but if you do, can you tell me who it was?
A. I think it starts with a V. He's a sergeant, I think.
Q. Is it the guy right here?
A. Yeah.
Q. VanCamp?
A. VanCamp, yeah.
Q. Thank you.
A. Sorry.
Q. And when you made that statement or you talked to -- I'm sorry. We'll say when you talked to Deputy VanCamp, Sergeant VanCamp, was that in the elections area within that, not the recount, just within the building portion?
A. It was outside of the main doors to the Elections Office.
Q. Where security is outside?
A. Yes.
Q. How long do you think passed before you went out and told the -- Sergeant VanCamp?
A. I can't honestly gauge that. It was a long day with the

recount, but like I said, I couldn't step away for a while until there was someone else to cover the front desk.

Q. And why did you feel the need to tell him?

A. Because personally from what I've experienced and what I've done, I -- I don't take kindly to that kind of behavior or language.

MR. HALL: Thank you. Nothing further.

THE COURT: Your cross-examination, Counselor.

CROSS-EXAMINATION

BY MR. MUISE:

Q. Good afternoon, ma'am. Ma'am, I'm Robert Muise. I represent the defendant in this case, Mr. Andrew Hess. Counsel asked you that you -- you were working on December 15th, 2023. What was your actual position, your title?

A. It was Office Assistant Senior or Office Support Clerk Senior.

Q. Did you have any role as whatsoever in the recount?

A. Not in that one, no.

Q. And did you -- you're not obviously one of the members of the Board of Canvassers?

A. I'm not a member of the Board of Canvassers, nor was I.

Q. And so this -- the alleged terrorist threat that you heard, that you put in quotes in your statement is, quote, "Hang Joe for treason," correct?

A. Correct.

Q. And that's it, correct?

A. Correct.
Q. Is that the statement that you told to Sergeant VanCamp when you went and reported to him?
A. I told him that I heard someone say that they would hang Joe for treason, yes.
Q. So you didn’t tell him that Andrew Hess said I am going to hang Joe for treason, correct?
A. I told him what I put in the report, to be as accurate as possible --
Q. Okay. So if you told him -
A. -- in my statement.
Q. - that the statement was I, Andrew Hess, am going to hang Joe for treason, that would have been incorrect, correct?

MR. HALL: Judge, she never said she made that statement, so how, how it could be incorrect?

THE COURT: Yeah. She admitted that she didn’t. She admitted what she said. She put it in the report, “Hang Joe for treason.” I don’t know if you can get her to get -- say anything beyond that, Counsel. Let’s move on.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. You said there were only you and Braden that were in the lobby when this statement was said in conversational tone, is that right?
A. I said I do not recall.

THE COURT: You're stuck with her answer, Counselor. Let's move on. She said she doesn't recall.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Did you have any -- strike that.

Were there any coworkers in the same vicinity that you were when you heard this statement?

A. I do not recall if anyone was in the lobby. They were in the recount room.

Q. So you recall seeing people in the recount room, but you don't recall seeing anybody else in the lobby, correct?

A. Correct.

Q. And so when you heard this statement, you didn't immediately go to the deputies and say arrest Mr. Hess, correct?

A. No, I did not do that.

Q. You actually waited a period of time before you even made the report to the law enforcement, correct?

A. Correct.

Q. So you didn't perceive any imminent harm at that point, correct?

A. Correct.

Q. When Mr. Hess allegedly made this statement, the two of you weren't engaged in a conversation, correct?

MR. HALL: Judge, I find the use of the word alleged after she's testified to it argumentative.

THE COURT: I agree. You want to rephrase your question to her, please.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. When Mr. Hess made the statement, quote, "Hang Joe for treason," per your testimony, he wasn't having a conversation with you, correct?

A. Correct.

Q. You simply overheard that statement, correct?

A. Correct.

Q. Do you have any personal knowledge of anyone other than you who then who heard that statement and then communicated to you that to law enforcement with a Mr. Rozell?

A. I don't know if anyone else said anything.

Q. Has anyone told you that they reported that statement to either Mr. Rozell or law enforcement?

MR. HALL: Judge, I'm gonna object to relevance --

THE COURT: I agree.

MR. HALL: -- and it does calls for hearsay.

THE COURT: I agree, sustained. Let's move on, Counsel.

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. Did you observe any deputy arrest Mr. Hess on December 15th, 2023?

A. No.

Q. I believe you observed a conversation that Mr. Hess had with Sergeant Van Camp. I believe you testified to seeing that, correct?

A. I was still in the lobby area at that point when every -- when other deputies had walked in, so I can't recall exactly everything I heard, but there was conversations happening between several people in the lobby.

Q. Did any of these deputies detain Mr. Hess?

A. I didn't see anyone being detained.

Q. Did you observe them searching Mr. Hess for any criminal contraband or items?

A. I didn't observe that.

Q. Did you observe at any time when you're -- on December 15th, 2023, that anyone had in their possession including Mr. Hess any rope?

A. I'm sorry. Any what?

Q. Rope.

THE COURT: You want to spell the word for her? Maybe --

THE WITNESS: Rope?

CROSS-EXAMINATION CONTINUING:

BY MR. MUISE:

Q. R-o-p-e.

A. Yeah. You're asking if I observed him with any rope?

Q. Yes.
A. No, I did not.
Q. Did you observe him with any nooses?
A. No, I did not.
Q. Did you see anybody erect any gallows anywhere on the property?
A. Of the courthouse?
Q. Yes.
A. No.
Q. To enter the courthouse, you have to go through security, correct?
A. Correct.
Q. Similar how you come to this court, you walk through an electronic detection that might pick up weapons or other items, correct?
A. Correct.
Q. Did you see Mr. Hess leave the circuit court building that -- after the recount that day?
A. No.
Q. You never witnessed anyone attempting to hang someone on December 15th, 2023, correct?
A. No.
Q. No one engaged in any act of violence on December 15th, 2023, correct?
A. No act of violence.

Q. You said no?
A. Yep, no acts of violence.
Q. Nobody was personal -- personally injured on December 15th, 2023, as far as you observed?
A. As far as I observed, nobody was personally injured.
Q. Now, there were two deputies that were on duty inside the recount room. Were there other law enforcement people in the lobby or in the security area of the circuit court building?
A. Yes.
Q. Do you know how many there were?
A. No. I -- I couldn't have counted.
Q. But there were additional law enforcement people on site on December 15th, 2023, in addition to the two that were in the recount room, correct?
A. Occasionally, some would walk in, walk out, check in, check in with command.
Q. Did you ask any of those law enforcement officers to go arrest Mr. Hess based on what you heard?
A. I didn't ask the deputies to arrest anyone.
Q. Did you ever have -- did you ever personally have a conversation with Mr. Rozell on December 15th, 2023?
A. I might've seen him in passing. I -- I don't recall.
Q. Did you ever tell Mr. Rozell on December 15th, 2023 at any time after that the precise alleged -- the precise threat according to what you've testified to was, quote, "Hang Joe for

treason?"

A. I don't recall if I directly said it to him or a supervisor.

Q. And, to be clear, Mr. Rozell was not in the lobby at all during the time when you heard this of this hang Joe for treason threat that you testified to, correct?

A. Correct. He was not in the lobby at that time.

Q. No member of the Board of Canvassers was there, as far as you recall?

A. As far as I recall, no.

Q. I'm referring to the lobby.

A. To the lobby?

Q. Yeah.

A. I don't recall them being in the lobby.

MR. MUISE: No further questions, your Honor.

THE COURT: Thank you. Anything on redirect, Mr. Hall, for this witness?

MR. HALL: Nothing.

THE COURT: May she be thanked and excused?

MR. HALL: Please.

THE COURT: Thank you. Ma'am, you're thanked and excused. Be careful stepping down. Thank you for your patience with the Court this afternoon.

(At 12:20 p.m., witness excused.)

THE COURT: Let the record reflect that the Court will be in recess at this time and we will return for further

testimony and the continuation of the preliminary exam will be Friday, June the 21st. It will start at nine. If you're running a little late, take it easy, take a breather.

MR. MUISE: Could we -- can we set it at ten, your Honor, just we got a long trial.

THE COURT: That's fine, ten.

(At 12:20:00 p.m. to 12:20:17, brief off the record discussion regarding date.)

THE COURT: All right, thank you everyone. I want to thank everyone for their patience this afternoon -- I mean this morning -- well, through the afternoon. I did have jailers this morning and of course our long state law docket, as usual on Tuesdays and Thursdays here.

MR. MUISE: And how would the Court like -- do you want me to keep possession of these?

THE COURT: No. You keep your -- you keep those, you keep those. Thank you.

(At 12:21 p.m., proceedings concluded.)

_ _ _

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

I certify that this transcript consisting of 84 pages, is a complete, true and correct record of the proceedings and testimony taken in this case on Thursday, May 30, 2024.

June 5, 2024 Gwendolyn D. Jefferson

Gwendolyn D. Jefferson, CSR-7127

50th District Court

70 North Saginaw

Pontiac, Michigan 48342

(248) 758-3875

# EXHIBIT B

[Video of Public Comment – Filed in the Traditional Manner]

# EXHIBIT C



tabbies
DEFENDANT'S EXHIBIT
C

# EXHIBIT D



DEFENDANT'S EXHIBIT
Q

# EXHIBIT E

[Deputy Bodycam Video – Filed in the Traditional Manner]

# EXHIBIT F

COUNTY OF OAKLAND

Page __ of __

# OFFICE OF THE SHERIFF

MICHAEL J. BOUCHARD

**STATEMENT**

Date & Time: 12/15/23

Complaint #: 23-315137

Full Legal Name: Andrew Hess

Date of Birth: 03/25/1986

Driver's License #: ____________

Social Security #: ___/___/___ (Voluntary Disclosure)

Address: ____________

City/State/ZIP: ____________

Home Ph: ________ Cell: ________ Work: ________ Email: ________

Statement: " I AM BEING ACCUSED OF MAKING A THREAT AGAINST THE ELECTIONS COMMISSIONER JOE ROZELLE, BY SAYING HE IS COMMITTING TREASON ACCORDING TO 18 USC CH. 115 SECTION 2381 THE PENALTY FOR TREASON, IF FOUND GUILTY, IS "SHALL SUFFER DEATH." I NEVER THREATENED THE LIFE OF JOE [redacted]

Signature: ____________

Deputy Signature: [signature] 8096

# EXHIBIT G

4/2/2024 DW/AW

Page 1 of 1

STATE OF MICHIGAN
THE DISTRICT COURT-JUDICIAL DISTRICT NO. 50
County of OAKLAND

PROS. ORDER NO. 23-11437

WARRANT 240538FY

THE PEOPLE OF THE STATE OF MICHIGAN
VS.

ANDREW FRED HESS /63-23-011437-01
9805 Roseland
Livonia, MI 48150

Defendant(s)

Date of Offense: DECEMBER 15, 2023

Location: CITY OF PONTIAC

Complainant: JOSEPH ROZELL

Complaining Witness: SGT. PESCHKE

WITNESSES
SGT. PESCHKE, c/o OCSO
DEP. TOVAR
DEP. BRAMLETT
DEP. TALIERCIO
DEP. L. VANCAMP
JOSEPH ROZELL
KAITLYN HOWARD
REP. OF OCSO
(DT) RE: ALL RECORDINGS FROM CR NO. 23-315137
DIRECTOR PAZUCHOWSKI

A TRUE COPY
50th DISTRICT COURT
LYNETTE M. WARD-ADMIN.
BY: ____________
DEPUTY COURT

STATE OF MICHIGAN, COUNTY OF OAKLAND

To any peace officer or court officer authorized to make arrest: The complaining witness has filed a sworn complaint in this court stating that on the date and the location described, the defendant, contrary to law,

did threaten to commit an act of terrorism and did communicate that threat to another person; Contrary to the statute in such case made and provided and against the peace and dignity of the People of the State of Michigan. MCL 750.543m. [750.543M]
FELONY: 20 Years and/or $20,000.00; reimburse government for expenses incurred from violation (see MCL 750.543x & 769.1f)

FALSE REPORT OR THREAT OF TERRORISM

WHEREAS on examination of said sworn COMPLAINT by me, it appears to me that said offense has been committed and there is just cause to suspect that said Defendant(s) are guilty thereof: THEREFORE IN THE NAME OF THE PEOPLE OF THE STATE OF MICHIGAN, you and each of you are hereby commanded forthwith to take the said Defendant(s) and bring them before this Court, to be dealt with according to law.

Dated: 4/4/2024 ____________ District Judge/Magistrate

No. ____________

RETURN ON WARRANT

BY VIRTUE OF THIS WARRANT, I HEREBY CERTIFY AND RETURN THAT I HAVE TAKEN THE SAID DEFENDANT BEFORE THE SAID DISTRICT COURT, AS COMMANDED

Dated: ____________, 20 ____ SIGNED: ____________
DEPUTY SHERIFF, COURT OFFICER OR POLICE OFFICER

ORIGINAL
RETURN TO COURT

2024 APR -3 A 8:20

# EXHIBIT H

# State of Michigan — ORDER / JUDGMENT FOR:

**Ticket / Case Number:** 240538FY

**50th Judicial District Court**
70 N. Saginaw Street, Pontiac, MI 48342
ORI # MI630075J Phone # 248.758-3820

[X] Pretrial - Release [ ] Custody [ ] Sentence
[ ] Amended [ ] Commitment to Jail [X] Video Arraignment

THE PEOPLE OF
State of Michigan [X]
(City, Twp, Village) [ ] PONTIAC

V

Defendant's Name, Address, and Telephone Number

| | |
|---|---|
| Name | HESS/ANDREW/FRED |
| Address | |
| City, State, Zip | |
| D.O.B. | 03/25/86 |
| SSN# | |
| CTN / TCN | |
| SID # | |

| Date of Arrest | Type of Arrest | Arresting Agency | Agency File No. |
|---|---|---|---|
| | [ ] Civil [ ] Misdemeanor [X] Felony | | |

| Offense(s) | Statute/Ordinance/Citation # | Offense(s) | Statute/Ordinance/Citation # |
|---|---|---|---|
| # 1 FALSE REPORT OR THREAT OF TERRORISM | | # 4 | |
| # 2 | | # 5 | |
| # 3 | | # 6 | |

**Purpose of Next Appearance** PROBABLE CAUSE CONF **Time of Appearance** 1:30PM **Date of Appearance** 04/16/24

**Place of Next Appearance** [ ] **At the Court Address Above** [ ] **Other** ______ **Bond Denied** [ ]

**Type of Bond** (Minimum Conditions Required Prior to Release)
[ ] Cash [ ] Cash / Surety [ ] Cash/Surety - **10% Cash** [X] **Personal** Amount/Value of Bond: $ 20,000.00
[ ] Real Property (Proof of Value and Interest in Real Property is Required) [ ] Tether-(type) ______

**Other Bond Conditions**
1 [X] The Defendant / Juvenile shall post a new Bond [MC 241]. Any additional conditions are specificed in Item #2.
2 [X] Conditions to be specified in the Bond are: Expiration Date: ______
[X] Defendant shall appear for all Court appearances [ ] No alcohol or illicit non-prescribed drug use
[X] Defendant may not leave the State of Michigan without permission of the Court
[X] Defendant shall notify the Court of any address change
[X] Other NO CONTACT W/VICTIM;NO WEAPONS; NO ALC/DRUGS

**IT IS ORDERED**
[ ] Probation is revoked [ ] Bond is revoked [ ] Photo I.D. Required for Delayed Sentences
[ ] Defendant is sentenced to Jail as follows:

| Offense(s) | Sentenced Mos | Sentenced Days | Credited Mos | Credited Days | To Be Served Mos | To Be Served Days | Release Authorized for the Following Purpose |
|---|---|---|---|---|---|---|---|
| #1 | | | | | | | [ ] Time to Pay Fines/Costs |
| #2 | | | | | | | [ ] For School Attendance |
| #3 | | | | | | | [ ] For Medical Treatment |

[ ] Work Release Granted (If Eligible)
[ ] Defendant ordered immediately released: [ ] Upon Payment of: ______
[ ] Other: ______

Defendant's Signature ______ Judge / Magistrate ______

Date: 04/04/24 Bar No. Judge Jeremy D. Bowie P80657

# EXHIBIT I

SEAL OF THE CHARTER COUNTY OF WAYNE, MICHIGAN · 1796 · WE PRODUCE · WE DEFEND · IN GOD WE TRUST · FREEDOM OF MAN

Cathy M. Garrett
Wayne County Clerk

# Office of the Wayne County Clerk

## Vital Statistics Division

April 04, 2024

Andrew Fred Hess
9805 Roseland St
Livonia, MI 48150-2794

Dear Mr. Hess:

This letter is to inform you that this office has received a court order or notification of a change in your eligibility to carry a concealed pistol by a law enforcement agency, prosecuting official, or court. As a result, your Michigan Concealed Pistol License (CPL) is suspended effective 04/04/2024, for the reasons stated below:

Reason for suspension: Bond Conditional Release Order - Date of Order: 04/04/2024 – Expiration Date N/A
Contact information for the source of the record: 50th District Court - 248-758-3800

You must promptly surrender your CPL to this office. Failing to surrender a CPL is a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $500.00, or both.

If you believe this information to be inaccurate, it is your responsibility to contact the source of the record(s) noted above to correct any errors that have resulted in this suspension. Pursuant to Michigan Compiled Law 28.425d, you may appeal this notice of suspension to the circuit court of the county in which you reside.

Once eligible, you may contact this office prior to the expiration of your Michigan CPL to request a reinstatement. If your CPL is expired, you must reapply for a new CPL.

Sincerely,

Cathy M. Garrett

Cathy M. Garrett, Wayne County Clerk
Wayne County

# EXHIBIT J

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

Elizabeth T. Clement,
Chief Justice

Brian K. Zahra
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas,
Justices

conv
March 28, 2025

168181 & (45)(46)

PEOPLE OF THE STATE OF MICHIGAN,
Plaintiff-Appellant,

v

SC: 168181
COA: 371542
Wayne CC: 24-001354-FH

MICHAEL JOSEPH KVASNICKA,
Defendant-Appellee.

_______________________________________/

On order of the Court, the motion for immediate consideration is GRANTED. The application for leave to appeal the February 13, 2025 judgment of the Court of Appeals is considered and, pursuant to MCR 7.305(H)(1), in lieu of granting leave to appeal, we VACATE the judgment of the Court of Appeals and REMAND this case to that court for further consideration. We express no opinion on whether MCL 750.543m violates constitutional free-speech protections by imposing criminal liability without proof "that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman v Colorado*, 600 US 66, 69 (2023). On remand, the Court of Appeals shall address the proper interpretation of MCL 750.543m in light of: (1) MCL 750.543z, which provides that "a prosecuting agency shall not prosecute any person or seize any property for conduct presumptively protected by the first amendment to the constitution of the United States in a manner that violates any constitutional provision"; and (2) the constitutional-doubt canon, see *Sole v Mich Econ Dev Corp*, 509 Mich 406, 419-420 (2022). The Court of Appeals shall also address: (3) whether it is appropriate to adopt a limiting construction of MCL 750.543m to remedy any remaining constitutional deficiency, see *People v Burkman*, 513 Mich 300, 340 (2024); see also *Osborne v Ohio*, 495 US 103, 115 (1990); (4) if so, what that limiting construction should be; and (5) whether the Wayne Circuit Court abused its discretion by dismissing the case without prejudice on February 24, 2025, where doing so necessarily implicated "aspects of the case involved in the interlocutory appeal" while an application for leave to appeal remained pending with this Court. *People v Scott*, 513 Mich 180, 200 (2024); see

MCR 7.215(F)(1)(a); MCR 7.305(C)(6)(a). The motion to expedite and/or stay precedential effect is GRANTED to the extent it requests expedited consideration of the application and is DENIED in all other respects.

We do not retain jurisdiction.

I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

March 28, 2025

Clerk

b0326