UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ANDREW HESS,

    Plaintiff,

    v.

OAKLAND COUNTY, MICHIGAN;
KAREN McDONALD, Oakland County
Prosecutor, Oakland County, Michigan;
JOE ROZELL, Director of Elections,
Oakland County, Michigan; MICHAEL
J. BOUCHARD, Oakland County
Sheriff, Oakland County, Michigan; and
MATTHEW PESCHKE, Sergeant,
Oakland County Sheriff's Office,
Oakland County, Michigan,

    Defendants.

No. 2:25-cv-10665-GAD-KGA

**FIRST AMENDED COMPLAINT**

Hon. Gershwin A. Drain

[Demand for Jury Trial]

Plaintiff Andrew Hess ("Plaintiff"), by and through undersigned counsel, brings this First Amended Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof alleges the following upon information and belief:

**INTRODUCTION**

1.    The weaponization and abuse of government power to attack and silent political opponents must stop.  For nearly a year, Plaintiff Hess has been subject to a patently unconstitutional prosecution, causing the deprivation of his fundamental rights.  Plaintiff has been publicly and falsely portrayed as a violent criminal, and he

and his family have suffered great pain, emotional distress, and financial harm as a result of this politicized and unlawful persecution brought against him by Oakland County officials and by the unlawful policy and practice of Oakland County and its officials, in particular Defendant McDonald, to target individuals who dare to challenge the validity of the elections and the actions of election officials in the County.

2.     Plaintiff seeks a declaration that Defendants violated his clearly established constitutional rights as set forth in this First Amended Complaint; a declaration that the policy and practice of targeting individuals who challenge the validity of elections or the actions of election officials violates the United States Constitution as set forth in this First Amended Complaint; a declaration that Defendant Rozell cast Plaintiff in a false light under Michigan law; a declaration that Michigan Compiled Laws § 750.543m, the criminal statute that served as the basis for the unlawful prosecution of Plaintiff, is unconstitutional facially and as applied; an injunction enjoining the enforcement of Michigan Compiled Laws § 750.543m, facially and as applied; and an award of nominal, compensatory, and punitive damages.  Plaintiff also seeks an award of his reasonable costs of litigation, including attorneys' fees and expenses.

## JURISDICTION AND VENUE

3.     This action arises under the First, Second, Fourth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Michigan law. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367(a).

4.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by *Ex Parte Young*, 209 U.S. 123 (1908), and by the general legal and equitable powers of this Court.

5.     Plaintiff's claim for damages is made pursuant to 42 U.S.C. § 1983, and other applicable law, including Michigan common law.

6.     Plaintiff's request for an award of his reasonable attorney fees, costs, and expenses is authorized by 42 U.S.C. § 1988, and other applicable law.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

8.     Plaintiff Andrew Hess is an adult citizen of the United States.  Plaintiff is married, and he and his wife have four young children.  They reside together in Livonia, Michigan.

9.     Defendant Oakland County is a municipal entity organized and existing under the laws of the State of Michigan.  It is a municipal corporation with the right to sue and be sued.

10.     Defendant Karen McDonald is the Oakland County Prosecutor, and she was the authorized decision maker for Oakland County to pursue the unlawful and politicized prosecution of Plaintiff and to execute the policy and practice to target for adverse and retaliatory treatment individuals, including Plaintiff, who challenge the validity of elections and the actions of election officials in Oakland County (also referred to herein as the "Targeting Policy").

11.     Defendant McDonald possesses final policymaking authority to decide whom to arrest, investigate, prosecute, and threaten to prosecute on behalf of Defendant Oakland County.  In other words, Defendant McDonald is the policy maker for the use of the county's law enforcement resources.  While Defendant McDonald may enjoy broad prosecutorial immunity for the actual decision to prosecute Plaintiff under Michigan Compiled Laws § 750.543m, she does not possess such immunity for weaponizing her office through the adoption and implementation of a policy to target political opponents based on their political opinions and viewpoints, as she did in this case.  It is not a prosecutorial function to abuse government authority to silence protected speech, to retaliate against individuals for engaging in protected speech, or to chill private citizens from

challenging or criticizing the conduct of elections, as set forth in this First Amended Complaint.  Defendant McDonald is sued in her individual capacity for all actions set forth in this First Amended Complaint that are not strictly prosecutorial functions.  Such conduct that falls outside the cloak of prosecutorial immunity includes instances where Defendant's actions are not intimately associated with the judicial process, including investigative efforts to obtain an unlawful arrest warrant for Plaintiff, authorizing the investigation of Plaintiff, advising the County Sheriff on the investigation, using the media to promote her political agenda, and issuing press releases.

12.     Plaintiff's claims for declaratory and injunctive relief challenging Michigan Compiled Laws § 750.543m are brought against Defendant McDonald in her official capacity and pursuant to *Ex Parte Young*, 209 U.S. 123 (1908).

13.     Defendant Joe Rozell is the Director of Elections for Oakland County. He cast Plaintiff in a false light, and he personally influenced and/or recommended the Oakland County Prosecutor to pursue the unlawful and politicized arrest and prosecution of Plaintiff and to advance the Targeting Policy of the County as set forth in this First Amended Complaint.

14.     Defendant Michael J. Bouchard is the Oakland County Sheriff.  He personally influenced, participated in, and/or recommended the unlawful and politicized arrest and prosecution of Plaintiff as set forth in this First Amended

Complaint.  As the Oakland County Sheriff, Defendant Bouchard is responsible for the Oakland County Jail.

15.    Defendant Matthew Peschke is a sergeant with the Oakland County Sheriff's Office.  He was the lead investigator of Plaintiff for Oakland County, and personally influenced, participated in, and/or recommended the unlawful and politicized arrest and prosecution of Plaintiff as set forth in this First Amended Complaint.

16.    Defendant Oakland County's decisions, laws, policies, practices, customs, and/or procedures were the moving force behind the constitutional violations set forth in this First Amended Complaint.

17.    At all relevant times, Defendant Oakland County trained, supervised, and employed Defendants McDonald, Rozell, Bouchard, and Peschke.

18.    Defendant Oakland County's deficient training and supervision of Defendants, particularly with regard to Defendants' duty to safeguard and secure the First Amendment rights of private citizens, were done with deliberate indifference as to their known or obvious consequences and were a moving force behind the actions that deprived Plaintiff of his fundamental constitutional rights as set forth in this First Amended Complaint.

## STATEMENT OF FACTS

19.    Public confidence in the integrity of Michigan elections is exceedingly

low, and for good reasons.

20.     Michigan elections are not as pristine as certain government officials, including Defendants McDonald and Rozell, would like the public to think.  For example, and by way of background, in 2020 Donald Trump lost Michigan by a mere 154,188 votes.  This is a *fraction* of the vote when you consider the fact that there were approximately 3 million absentee ballots alone (the most in Michigan history).  Consequently, Trump only lost by approximately 5% *of the absentee ballots*.  This is a critically important fact because Secretary of State Jocelyn Benson's guidance on how these absentee ballots should be treated (she directed the clerks "*to presume that signatures are valid*") was declared unlawful.  *See Genetski v. Benson*, 2021 Mich. Ct. Cl. LEXIS 3, *12, 19 (Mar. 9, 2021) ("[T]he standards issued by defendant Benson on October 6, 2020, with respect to signature-matching requirements amounted to a 'rule' that should have been promulgated in accordance with the APA.  And absent compliance with the APA, the 'rule' is invalid.").  But that decision was issued too late to do anything to remedy the *unlawful* guidance or to prevent its adverse impact on the election.

21.     Secretary Benson's guidance to election officials was problematic as the courts have long held that mail-in ballots are exceedingly susceptible to fraud.  As the Commission on Federal Election Reform—a bipartisan commission chaired by former President Jimmy Carter and former Secretary of State James A. Baker III

and cited extensively by the United States Supreme Court—observed, "the 'electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.'"  Building Confidence in U.S. Election, Report of the Commission on Federal Election Reform at 46 (Sept. 2005) ("Carter-Baker Report").  According to the Carter-Baker Report, mail-in voting is "*the largest source of potential voter fraud*."

22.    Many well-regarded commissions and groups of diverse political affiliation agree that "when election fraud occurs, it usually arises from absentee ballots."  Michael T. Morley, Election Emergency Redlines at 2 (Mar. 31, 2020). Such fraud is easier to commit and harder to detect.  As one federal court put it, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas,* 385 F.3d 1128, 1131 (7th Cir. 2004); *see also id.* at 1130-31 (voting fraud is a "serious problem" and is "facilitated by absentee voting").

23.    Accordingly, courts have repeatedly found that mail-in ballots are particularly susceptible to fraud.  As Justice Stevens noted, "flagrant examples of [voter] fraud . . . have been documented throughout this Nation's history by respected historians and journalists," and "the risk of voter fraud" is "real" and "could affect the outcome of a close election."  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 195-96 (2008) (plurality op of Stevens, J) (collecting examples). Similarly, Justice Souter observed that mail-in voting is "less reliable" than in-

person voting. *Id.* at 212, n.4 (Souter, J., dissenting) ("'[E]lection officials routinely reject absentee ballots on suspicion of forgery.'"); *id.* at 225 ("[A]bsentee-ballot fraud . . . is a documented problem in Indiana."); *see also Veasey v. Abbott,* 830 F.3d 216, 239, 256 (5th Cir. 2016) (*en banc*) ("[M]ail-in ballot fraud is a significant threat"—so much so that "the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting."); *id.* at 263 ("[M]ail-in voting . . . is far more vulnerable to fraud."); *id.* (recognizing "the far more prevalent issue of fraudulent absentee ballots"). We will never know the true impact of Secretary Benson's unlawful guidance on the 2020 election.

24. Additionally, in *Johnson v. Secretary of State*, 506 Mich. 975 (2020), the Michigan Supreme Court denied a petition for an extraordinary writ that simply sought an independent audit of the votes in the 2020 election. Notably, Secretary Benson *vigorously* opposed the petition, which ultimately failed by a vote of 4 to 3 (hardly a decisive victory for the Secretary). In his dissent, Justice Viviano stated, in relevant part, the following:

> For the second time in recent weeks, individuals involved in last month's election have asked this Court to order an audit of the election results under Const 1963, art 2, § 4. . . . As in that case, *petitioners here allege that election officials engaged in fraudulent and improper conduct in administering the election*. In support of these claims, *petitioners have submitted hundreds of pages of affidavits and expert reports detailing the alleged improprieties*. Here, as in *Costantino*, I would grant leave to appeal so we can determine the nature and scope of the constitutional right to an election audit. After all, "[i]t is emphatically the province and duty of the judicial department to say

- 9 -

what the law is." *Marbury v Madison*, 5 US (1 Cranch) 137, 177 (1803). But I write separately to highlight the lack of clarity in our law regarding the procedure to adjudicate claims of fraud in the election of presidential electors.

*Johnson*, 506 Mich. at 984-85 (Viviano, J., dissenting) (emphasis added). In other words, there was ample evidence to question the integrity of the 2020 election in Michigan.

25.     In 2018, Michigan voters passed proposal 3, which resulted in significant changes to Michigan's elections laws, including the institution of absentee voting *for any reason*, automatic voter registration, and the ability to register up to and on Election Day, thereby making it easier to engage in election fraud in Michigan. In 2019, Secretary of State Benson convened an Election Modernization Advisory Committee to advance these election reforms. Defendant Rozell was selected to participate on this committee.

26.     Due to the proliferation of mail-in ballots in Michigan, voter fraud is a real threat to the fairness and integrity of the elections held in Michigan.

27.     It does not threaten "democracy" to challenge elections and the actions of election officials—which private citizens, including Plaintiff, have a fundamental and clearly established constitutional right to do. Rather, the true threat to "democracy" is Defendants' coordinated campaign to use the instruments of government to attack political opponents and to silence free speech. Undoubtedly, the purpose of this strategy (described shorthand as the Targeting Policy in this First

Amended Complaint) is to chill those who might raise concerns about the conduct of an election or the actions of election officials.  This strategy (and policy) is on full display in this case, and it was instituted in an effort to impact the 2024 general election, as well as other elections.

28.    "Democracy" will not survive unless the federal courts stop this frontal attack on the First Amendment.  The state courts are politicized and ill-prepared to protect federal constitutional rights, particularly in this context, as demonstrated by this politicized and unlawful prosecution of Plaintiff and the associated state court proceedings.  It should come as little surprise that Defendant McDonald was herself an Oakland County Circuit Court Judge and thus a former member of the court where she sought to prosecute Plaintiff and where Plaintiff received no justice.

29.    Fair Election Fund, a public interest organization, recently released a comprehensive 51-page report evaluating Secretary of State Benson's election administration performance as measured against the five pillars of an effective electoral system as set forth in the Carter-Baker Report.  The Fund graded the Secretary's administration of elections with an overall "D" grade, focusing in particular on the Secretary's lack of transparency in election processes and loss of voter confidence.  Defendant Rozell is part of this abysmal administration of elections.  As stated in the Carter-Baker Report, "[I]f elections are defective, the

entire democratic system is at risk."  This is the very point made by Plaintiff at the 2023 recount.

30.    On December 15, 2023, a recount of an election that occurred in November 2023 in Oakland County ("County") was held at the Election Division Training Room ("Recount Room") inside the County Courthouse.  Defendant Rozell, the Director of Elections for the County, was overseeing the recount. Deputies from the County Sheriff's Office were present to provide security.  Several members of the public attended as observers.  Plaintiff was present, and he was a designated poll challenger.

31.    At times, the recount became heated as some of the observers and challengers complained that cheating was taking place.  In fact, challenges were filed to the ongoing process.  Plaintiff was one of the challengers, complaining about the fact that seals on the ballot bags appeared to be tampered with, calling into question the chain of custody for the ballots.  Plaintiff's challenges were ignored by Defendant Rozell and other election officials.

32.    At one point, Plaintiff departed the Recount Room and went out into the lobby.  And while in the lobby, which was largely empty, a receptionist for the County, Kaitlyn Howard, allegedly overheard Plaintiff state "Hang Joe for treason." Ms. Howard was not a party to any conversation with Plaintiff nor an intended recipient of any statements made by Plaintiff.   The statement was made in

conversational tone (*i.e.*, it was not "loudly said"), and, as noted, Ms. Howard was admittedly not an intended party to this conversation.  No other witness came forward regarding the making of this alleged "terrorist threat."  Neither Defendant Rozell nor any other election official was in the lobby at the time.  Defendant Rozell never heard this alleged statement from Plaintiff nor did Plaintiff ever make any direct threats to Defendant Rozell, as Defendant Rozell himself admitted under oath.

33.     After significant delay, Ms. Howard reported the alleged "threat" to the County deputies, who then proceeded to ask Plaintiff to exit the Recount Room for questioning.  Plaintiff willingly complied.

34.     Ms. Howard did not make an immediate report of the alleged "threat" because she knew that there was no threat of any imminent harm.

35.     During questioning, Plaintiff made clear to the County deputy, as evidenced in the case report, that "all [Plaintiff] did was accuse [Defendant Rozell] of a crime, and it would be like saying [if] somebody murdered someone they go to jail for the rest of their life."  This interview was recorded by the deputy's body camera.  Plaintiff also told the deputy on video that "I didn't make a threat," and he is heard on the body camera video telling another person that he denied making a threat and that "I said I accused him of a crime."  In the written statement Plaintiff provided to the deputy during this questioning, Plaintiff emphatically stated, "I never threatened the life of Joe."

- 13 -

36.     Following this questioning, Plaintiff was permitted to reenter the Recount Room where Defendant Rozell and the other election officials were located. Plaintiff was not arrested, searched, or detained, nor was he told to leave the recount. The building wasn't evacuated or searched.  Reinforcements were not called.  No "terrorist threat" protocols or immediate actions were employed.  And no special security detail was provided for Defendant Rozell.  Nothing.  In other words, *no one* perceived or understood there to be any threat of terrorism that day or that Plaintiff posed any threat to anyone, including Defendant Rozell.

37.     During the public comment period, Plaintiff proceeded to make a speech about cheating on elections, and he expressed the opinion, which is core political speech protected by the First Amendment, that people who cheat on elections should be prosecuted for treason.  In other words, Plaintiff confirmed everything that he had just told the deputy and that he put in his written statement.

38.     The law enforcement officials involved with the unlawful prosecution of Plaintiff, including Defendants McDonald, Bouchard, and Peschke, confirmed that nothing Plaintiff said during this public comment period or in the Recount Room served as a basis for the felony charge that was eventually brought against Plaintiff.

39.     During Plaintiff's speech, deputies stood by listening with their arms folded.  Below is a true and accurate picture showing Plaintiff making his comments during the public comment period while the deputies listened with their arms folded.

- 14 -

Once again, this speech was made *after* Plaintiff was confronted by a deputy for allegedly making a "terrorist threat."  In sum, there *never* was any threat of terrorism.



40.     The deputies at the recount provided written statements confirming that they never heard Plaintiff making any threats, and they confirmed that Plaintiff was expressing the opinion that cheating on elections was treason.

41.     After making his public comments during the comment period, Plaintiff departed the County courthouse without incident.  He was not arrested nor detained, and the deputies never provided any personal security for Defendant Rozell because none was needed.

42.     Defendants Bouchard, McDonald, and Peschke had available for their review, and, in fact, did review before recommending and thus commencing the unlawful arrest and prosecution of Plaintiff all of this evidence, including the video of Plaintiff's interview and public comments, and they had access to the witnesses.

43.     This evidence (and more) was intentionally omitted by Defendants Oakland County, McDonald, Bouchard, and Peschke when they sought a warrant

for Plaintiff's arrest.

44.    No reasonable law enforcement officer would ever consider charging Plaintiff with the felony offense of making a terrorist threat based on this evidence. The only reason for charging Plaintiff was for the improper purpose of targeting him based on his political opinions and viewpoints and to send a threatening and chilling message to those who may challenge election officials or accuse them of election malfeasance (Targeting Policy).

45.    Prominent members of the Democratic Party in Michigan have publicly called for the hanging of Trump supporters without fear of prosecution or reprisals.



46.    No county prosecutor has threatened these members of the Democratic

Party with prosecution under Michigan Compiled Laws § 750.543m, which is a state statute that should apply to all Michiganders, nor have Defendants McDonald or Bouchard publicly called for these members to be held criminally accountable for their speech.

47.     Pro-Palestinian Muslim protestors in Dearborn, Michigan have publicly chanted "death to America" and "death to Israel."  However, there is no threat of prosecution for them under Michigan Compiled Laws § 750.543m, nor have Defendants McDonald or Bouchard publicly called for these individuals to be prosecuted for their speech.

48.     Protestors in Oakland County are permitted to very publicly display signs calling President Trump a "traitor" (*i.e.*, someone who commits treason, a capital offense) and calling for his assassination ("86 47"), and those individuals who made these "threats" have not been investigated, arrested, or prosecuted under Michigan Compiled Laws § 750.543m by Defendants Oakland County, McDonald, Bouchard, or Peschke because these protestors are expressing a message that Defendants agree with politically.

 

49.     Moreover, even today you can purchase online Trump "traitor" or "Hang Biden for Treason" t-shirts, demonstrating that Plaintiff's alleged "threat" is political hyperbole at best.

50.     Here, Defendant McDonald, a prominent member of the Democratic Party, weaponized her office and the resources of Defendant Oakland County to punish a political opponent who made a political and hyperbolic comment in an empty lobby that was overheard by a secretary who was not an intended recipient of the comment nor a party to the conversation.  Defendants investigated, arrested, falsely maligned, and maliciously and selectively prosecuted Plaintiff to make him an example for political purposes, and all Defendants willingly cooperated and complied with this political and unlawful targeting of Plaintiff.

51.     Beginning in January 2024, media started to report, based on false statements by Defendant Rozell, that Plaintiff had personally threatened Defendant Rozell during the recount and that the Oakland County Prosecutor was looking into possibly prosecuting Plaintiff for his speech.  Defendants McDonald and Rozell used the media as part of their intimidation scheme (Targeting Policy).

52.     On January 10, 2024, CBS News published false statements made by Defendant Rozell about Plaintiff.  In this news story, Defendant Rozell claimed, on video, that he was "threatened by a man during a ballot recount."  More specifically, Defendant Rozell was directly quoted (and appeared on video stating) as follows:

"They were upset that we were advising the board how to conduct the recount in accordance with the statute, and this individual didn't like that, and so *he said that he was going to hang me*."  Defendant Rozell continued, "It was very unnerving.  I felt threatened, concerned.  And so, we did have sheriff's deputies here on the scene, and he was confronted and a report was taken by the sheriff's department." Defendant Rozell further stated, "When you come and *your goal is to intimidate and bully and threaten to harm the people who are doing these types of things, that's the wrong way to go about this, and it's a crime*."  This news story was aired on television, and it is published online at https://www.cbsnews.com/detroit/news/oakland-county-director-of-elections-allegedly-threatened-by-man-during-a-ballot-recount/.   Defendant Rozell's false statements were about and concerning Plaintiff, they cast Plaintiff in a false light, and they were made with a reckless disregard for the truth.

53.    Defendant Rozell's false statements impute the commission of a violent criminal offense and thus cast Plaintiff in a false light.

54.    Defendant Rozell's false statements harm the reputation of Plaintiff as to lower him in the estimation of the community and to deter others from associating or dealing with him.

55.    Defendant Rozell's false statements, endorsed and further replicated by Defendant McDonald, had the purpose and effect of vilifying individuals who

- 19 -

challenge the conduct of election officials in order to chill them from doing so in the future.

56.     Through the unlawful investigation, arrest, and prosecution of Plaintiff, discussed in further detail below, the Oakland County Prosecutor was seeking to promote the false political narrative that conservative Republicans, such as Plaintiff, are threatening the safety of our elections and election officials in order to adversely impact the election (Targeting Policy).  In other words, this unlawful investigation, arrest, and prosecution, and the media they intended to generate, including Defendant Rozell's false statements, were designed and intended to chill the free speech rights of those who might complain about or question the integrity of elections, including the 2024 general election, and the integrity of the actions of election officials, and this all was done in retaliation for Plaintiff's public opposition to the actions of election officials at the 2023 recount.

57.     This unlawful Targeting Policy, which also includes the unlawful investigation, arrest, and prosecution of Plaintiff and the associated media that falsely accused Plaintiff of committing a felony offense, was intended to chill political speech and to deter election observers and challengers from commenting upon or reporting potential election malfeasance committed by election officials during the general election.

58.     In an effort to prevent the initiation of such an unlawful and politicized

prosecution, on January 16, 2024, Plaintiff, through counsel, sent a letter to the Oakland County Prosecutor, copying the Oakland County Sheriff and Defendant Rozell, warning them that pursuing such a prosecution was unlawful under the U.S. Constitution.  Defendant Peschke also received a copy of this letter.  A true and correct copy of this letter is attached to this First Amended Complaint as Exhibit 1.

59.    Unfortunately, Defendants failed to heed the warning.  Instead, they pursued the unlawful investigation, arrest, and prosecution of Plaintiff as part of the Targeting Policy.

60.    In a press release issued on April 1, 2024, Defendant McDonald publicly announced that she "charged Andrew Fred Hess, a 37-year-old resident of Livonia" with violating Michigan Compiled Laws § 750.543m for allegedly making a terrorist threat, noting that this is "a felony offense punishable by up to 20 years imprisonment and/or a fine up to $20,000."  Defendant McDonald further confirmed the politicization of this prosecution and the existence of the Targeting Policy, stating, in reference to Plaintiff, that "***there are individuals who seek to undermine the integrity of the election process by threatening and intimidating election workers and supervisors.  Those threats don't just impact our election workers, they put our democracy at risk, and they will not be tolerated. I will do everything within my power to hold those who make such threats accountable***."  A true and correct copy of this press release is attached to this First Amended Complaint as

Exhibit 2.

61.     Michigan Compiled Laws § 750.543m states that "[a] person is guilty of making a terrorist threat . . . if the person . . . [t]hreatens to commit an act of terrorism and communicates the threat to any other person."  Pursuant to this felony statute, an "'[a]ct of terrorism' means a willful and deliberate act that is," *inter alia*, "*intended* to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion." Mich. Comp. Laws § 750.543b (emphasis added).   The statute also expressly provides that "a prosecuting agency *shall not* prosecute any person or seize any property for conduct *presumptively protected by the first amendment* to the constitution of the United States in a manner that violates any constitutional provision."  Mich. Comp. Laws 750.543z (emphasis added).   In fact, to prevent criminal prosecutions such as the one advanced against Plaintiff, in August 2020, a jury instruction was adopted that specifically provides that to establish a violation of § 750.543m, "the prosecution *must prove* that the threat"

> must have been a true threat, and *not have been* something like idle talk, or a statement made in jest, *or a political comment*.  It must have been *made under circumstances where a reasonable person would think that others may take the threat seriously as expressing an intent to inflict harm or damage*.

Mich. Crim. JI 38.4(3) (emphasis added).

62.     Accordingly, Michigan Compiled Laws § 750.543m proscribes only those statements that communicate "a serious expression of an intent to commit an act of terrorism" and that are "*intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion*."  Thus, the statute requires the existence of an intent to intimidate or coerce the conduct of government when communicating the alleged threat, and it expressly prohibits a prosecutor from pursing charges against someone for engaging in speech "presumptively protected by the First Amendment," and this includes political comments or opinion, such as those expressed by Plaintiff during the recount.

63.     There was no basis in fact or law for Defendants Oakland County, McDonald, Bouchard, or Peschke to have initiated any criminal proceedings in this case against Plaintiff nor for Defendant Rozell to claim that Plaintiff committed a crime.  Nonetheless, Defendants pursued this unlawful course of conduct as part of the Targeting Policy set forth in this First Amended Complaint.

64.     On April 4, 2024, Defendant Peschke appeared in the 50th District Court in Pontiac, Michigan, where he made false and misleading statements under oath in order to secure a warrant for Plaintiff's arrest.  The presiding judge did not bother to ask any pointed or relevant questions to actually determine whether there was probable cause to arrest Plaintiff for allegedly making a terrorist threat in

violation of § 750.543m.  Indeed, there was no probable cause, and this prosecution was barred by the First Amendment.  It was painfully evident that the judge knew nothing of the elements of the offense nor of the demands of the First Amendment.  Unfortunately, the judge simply rubberstamped the request and issued the warrant at the urging of Defendants Oakland County, McDonald, Bouchard, and Peschke.

65.    It is clearly established law that a government official, whether it be a prosecutor, a county sheriff, or a judge, may not base a probable cause determination on speech protected by the First Amendment.  Yet, that is precisely what happened in this case.

66.    Shockingly, Defendant Peschke provided the following sworn statement, which contained material falsehoods and omissions of material facts, to the court in order to secure an arrest warrant for Plaintiff:

> Judge, on December 15, 2023, Sergeant VanCamp, Deputy Taliecio, Deputy Bramlett and Deputy Tovar were security for a recount of an election from November at 1200 North Telegraph in Pontiac.  The people came to observe the recount process and as the day went on, challenges were filed for ongoing issues with the process.  During that day, Sergeant VanCamp was approached by Katelyn Howard, an employee for the recount who told him that one of the members -- one of the meetings got heated and one of the men got up and loudly said to hang Joe for treason.  He then walked back into the room where the recount was being conducted.  The man was later identified as Andrew Hess.  Sergeant VanCamp had him step into the hall or the lobby with him and Sergeant VanCamp notified Hess that he had a report that he stated that he was going to hang Joe Rozell for treason.  Hess slightly nodded his head yes.  Hess laughed and asked Sergeant VanCamp what the penalty for treason was, in which Sergeant VanCamp replied, hanging, and Sergeant VanCamp states that Hess smirked and nodded

his head yes, and said so all's I did was accuse him of a crime and it would be like saying [if] somebody murdered someone they go to jail for the rest of their life.[1]

Mr. Hess was allowed to reenter the recount room.  There was a break at 1:30.  Mr. Hess did not return.  Joe Rozell is the Huntington Woods City Commissioner and director of elections.  I called him on January 9th and spoke with him over the phone.  He advised me that he was present at the election recount at the 6th circuit court building on December 15th.  Rozell advised that Andrew Hess made threats to hang him for treason and he also saw Andrew Hess point to him during public comment and heard him say that cheating elections is treason.

Joe Rozell states that he was in fear of Hess, and he was in fear of his life due to Hess's comments.  This was submitted to the Oakland County Prosecutor's Office for threats.  It was returned to me with a warrant for threats of terrorism *from the Oakland County Sheriff's Office or the Oakland County Prosecutor's office*.

67.     Based on this materially false presentation, which itself does not establish probable cause for making a terrorist threat as a matter of law, a warrant issued for Plaintiff's arrest on April 4, 2024.  The warrant was invalid as a matter of law.

68.     As the person swearing out the warrant, Defendant Peschke knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for the warrant, and such statements or omissions were material, or necessary, to the finding of probable cause.   These falsehoods and omissions are evident by comparing Defendant

---

[1] Hess "laughed" and "smirked" because the suggestion that he threatened the life of anyone was patently absurd.

Peschke's statement with the undisputed facts set forth in this First Amended Complaint, and, in particular, comparing it with the sworn testimony of Defendants' only witnesses, Ms. Howard and Defendant Rozell.

69.     The undisputed facts demonstrate that there was no probable cause to establish a serious expression of an intent to commit an act of terrorism by Plaintiff.

70.     Moreover, it is clearly established that the First Amendment protects political statements, including vehement, caustic, and unpleasantly sharp attacks on government and public officials.  In other words, it was clearly established in December 2023, that Plaintiff's statement is protected by the First Amendment.

71.     Throughout the state court proceedings and as a direct result of the actions of Defendants, Plaintiff was deprived of his fundamental rights by the government's failure to adhere to the requirements of the First Amendment.  The prosecution was ultimately dismissed, ironically, because the Michigan Court of Appeals in another case held that the terrorist threat statute violated the First Amendment, and it was dismissed before Plaintiff could exhaust his right to appeal the lower courts' failure to protect his First Amendment rights.  In other words, in light of the facts and circumstances of the prosecution of Plaintiff, including the materially false statements and omissions presented by Defendant Peschke to unlawfully secure the warrant for Plaintiff's arrest, and in light of clearly established law, there is no precedential or estoppel effect of the fundamentally flawed and

illegal probable cause determinations made in the state court.

72.    As a direct and foreseeable result of this unlawful prosecution, Plaintiff was placed on a $20,000 personal recognizance bond, which deprived him of his liberty.  The bond conditions included, *inter alia*, conditions that restricted his travel, mandated his appearance in court, and deprived him of his fundamental right to bear arms protected by the United States and Michigan Constitutions.  In fact, Plaintiff was ordered to surrender his CPL, which he did.

73.    Following his initial appearance and pursuant to the illegal arrest warrant, Plaintiff was ordered to go to the Oakland County Jail for fingerprinting, where he spent two hours in a jail cell while his family nervously waited in the parking lot for his release.  This unlawful seizure of Plaintiff was a direct and foreseeable result of the unlawful prosecution, including the invalid and unlawful warrant for Plaintiff's arrest.

74.    Each time Plaintiff had to appear in court for this unlawful prosecution, he had to request time away from his employment.  Plaintiff works on commission only, so this prosecution caused a financial hardship for him and his family.

75.    The deprivation of Plaintiff's rights and the injuries he suffered as set forth in this First Amended Complaint were the direct and foreseeable consequences of the unlawful and malicious prosecution that Defendants initiated, influenced, made, and/or participated in against Plaintiff.

76.     During the preliminary examination on the felony charge, the prosecution presented two witnesses: Defendant Rozell and Kaitlyn Howard.  The district court judge denied Plaintiff's request to call as witnesses any of the deputy sheriff's present at the recount.  The Oakland County Circuit Court found that to be error and remanded the case for the taking of the deputies' testimony.  However, the district court dismissed the case prior to that happening.

77.     The deputy witnesses would have provided *further* evidence that there was no imminent threat to anyone and that no one present considered the alleged "threat" to be a "serious expression of an intent to commit an act of terrorism."  And Defendants knew that.

78.     In fact, these deputies also believe that this prosecution was bogus and should have never been initiated.  However, they are not in a decision-making or leadership role similar to Defendants, so their views did not matter to Defendants.

79.     During the preliminary examination, Defendant Rozell testified as follows:

> Q.     *Sir, Mr. Hess **never told you directly that he was going to hang you, correct***?
> A.     ***Correct***.
> Q.     ***So those words were never personally communicated to you by Mr. Hess at any time***?
> A.     ***Correct***.
> Q.     *Mr. Hess never communicated to you the words, quote, "Hang Joe for treason," correct?*
> A.     *Correct.*

- 28 -

Q.     These words, "Hang Joe for treason," are what Ms. Howard *claims she overheard Mr. Hess stating in the lobby*.  Are you aware of that?

A.     *Yes*.

Q.     And *you were not in the lobby to hear the words, quote, "Hang Joe for treason" that were allegedly uttered by Mr. Hess; is that correct*?

A.     *I was not in the lobby*.

Q.     *And at no time in the election recount room with you and the other election officials did Mr. Hess state, quote, "Hang Joe for treason;" is that correct?*

A.     Not that I recall, *correct*.

Q.     Okay.  At no time in the election recount room with you and the other election officials did Mr. Hess state, quote, "I'm going to hang Joe Rozell," end quote, correct?

A.     Correct.

Q.     **At no time while in the election recount room with you and the other election officials did Mr. Hess state that he was going to hang anyone?**

A.     **Not that I heard**.

80.     Defendant Rozell's sworn testimony demonstrates the falsity of the public statements he made during his television interview with CBS News and the materially false statements and omissions Defendant Peschke made to secure the warrant for Plaintiff's arrest.

81.     Ms. Howard, who works with Defendant Rozell, testified during the preliminary examination as follows:

Q.     And you made a statement, I believe it's approximately five lines long about what you had heard and saw, correct?

A.     Correct.

Q.     And you indicate that a person made a statement, "*Hang Joe for treason*."

A.     Correct.

* * * *

- 29 -

Q.    After hearing the statement and the response, what did you do?

A.    _Immediately, not much._  _I mean I couldn't leave my position at the front desk_.  I was the only one guarding it, so I had to wait a little bit until I was able to go out into the lobby and find a deputy or someone I could report what I had heard to without disrupting the recount.

\* \* \*

Q.    You actually waited a period of time before you even made the report to the law enforcement, correct?

A.    Correct.

Q.    _So you didn't perceive any imminent harm at that point, correct?_

A.    _Correct_.

\* \* \*

Q.    When Mr. Hess made the statement, quote, "Hang Joe for treason," per your testimony, _he wasn't having a conversation with you, correct_?

A.    _Correct_.

Q.    _You simply overheard that statement, correct?_

A.    _Correct_.

\* \* \* \*

Q.    And, to be clear, _Mr. Rozell was not in the lobby at all during the time when you heard this of this hang Joe for treason threat that you testified to, correct?_

A.    _Correct_.  He was not in the lobby at that time.

Q.    _No member of the Board of Canvassers was there, as far as you recall?_

A.    _As far as I recall, no_.

\* \* \* \*

MR. HALL (the special prosecutor):  I'd stipulate that _it was a normal conversational tone_.

\* \* \*

Q.    And why did you feel the need to tell [the deputy]?

A.    Because personally from what I've experienced and what I've done, I – **I don't take kindly to that kind of behavior or language**.

82.    Consequently, the _only_ witness to the alleged "threat" didn't consider

it to be a "serious expression of an intent" to commit harm.  Otherwise, she would

have acted as such and immediately sought law enforcement assistance.

83.    The facts set forth in the testimony of Ms. Howard, the main witness for the prosecution, were available to Defendants Oakland County, McDonald, Bouchard, and Peschke prior to arresting and bringing the felony charge against Plaintiff, and this testimony further demonstrates the materially false statements and omissions Defendant Peschke made to secure the warrant for Plaintiff's arrest.

84.    It is factually and legally impossible to assert that an off-hand comment (which itself is political commentary and hyperbole and thus protected by the First Amendment) made in a nearly empty lobby that was simply overheard by a receptionist who was admittedly not an intended recipient nor a party to the conversation constitutes a "serious expression of an intent to commit an act of terrorism," which further requires an intent on the part of the speaker to "influence or affect the conduct of government or a unit of government through intimidation or coercion."  This prosecution of Plaintiff was a gross, reckless, and illegal abuse of government power, and it was made as part of the Targeting Policy.

85.    Despite having all of these facts, including this sworn testimony from the government's own witnesses, following the preliminary examination, Defendants Oakland County and McDonald continued to pursue the unlawful prosecution of Plaintiff even after Plaintiff's counsel made repeated requests to the prosecutor to dismiss the charge.

86.    On February 13, 2025, the Michigan Court of Appeals held in a case

brought by the Wayne County Prosecutor (and thus not this case involving Plaintiff) that Michigan Compiled Laws § 750.543m was facially unconstitutional based on *Counterman v. Colorado*, 600 U.S. 66 (2023).  As a result of this binding decision from the Michigan Court of Appeals, Plaintiff's counsel promptly filed a motion to dismiss the prosecution against Plaintiff.  Defendant McDonald opposed the motion to dismiss and requested that the district court stay the prosecution.

87.    On March 6, 2025, the 50th District Court dismissed the case against Plaintiff, thus resolving the case in Plaintiff's favor.  Consequently, there are no ongoing state court proceedings against Plaintiff.  However, Plaintiff remains subject to prosecution under § 750.543m, and Defendants vow to pursue this prosecution yet again in the near future.

88.    The Wayne County Prosecutor asked the Michigan Supreme Court to reverse the Michigan Court of Appeals.  The Michigan Supreme Court vacated the Court of Appeals decision and remanded the case for further consideration.

89.    As noted, Defendants Oakland County and McDonald vow to re-charge Plaintiff with this felony offense, which has a six-year statute of limitations.  Consequently, there is an ongoing injury and substantial risk of future injury such that the injury is redressable and the requested prospective relief is appropriate and necessary.

90.    Defendants' actions, as set forth in this First Amended Complaint, have

- 32 -

caused, and will continue to cause, irreparable harm to Plaintiff.

91.     Defendants' actions, as set forth in this First Amended Complaint, have chilled and suppressed and will continue to chill and suppress Plaintiff's right to freedom of speech.

92.     Defendants' actions, as set forth in this First Amended Complaint, have caused Plaintiff to suffer pain, humiliation, emotional distress, and financial loss.

93.     Plaintiff is a young father of four children.  The unlawful felony prosecution hangs like a sword over his head and over the heads of his wife and young children.  Plaintiff's wife would often wake up in the morning in tears as she had a recurring nightmare of her husband being dragged off to jail.  This stress on Plaintiff's family resulted in a great deal of anxiety and emotional distress on Plaintiff.

94.     As a direct and foreseeable result of this unlawful prosecution, the Wayne County Clerk ordered Plaintiff to surrender his CPL, which he did. Plaintiff's work often takes him into dangerous neighborhoods in Detroit and elsewhere.  Plaintiff concealed carries for personal protection.  As a result of this unlawful prosecution, Plaintiff couldn't conceal carry, thereby exposing him to danger.  Similarly, because of this unlawful prosecution, Plaintiff had to remove all weapons from his home, thus depriving him of his ability to protect his family.

95.   For Christmas in 2024, Plaintiff and his wife wanted to get a puppy for their children from a breeder in Indiana.  However, due to the travel restriction imposed at the time, Plaintiff was unable to travel out of state.

96.   When Plaintiff sought additional employment to help with the cost of Christmas for his family, he failed the background check because of this unlawful felony charge and prosecution.

97.   By unlawfully prosecuting someone for conduct "presumptively protected by the First Amendment," as in this case, Defendants have chilled Plaintiff's fundamental right to freedom of speech and have punished him for his speech, thereby causing him to suffer further irreparable harm.

98.   This political prosecution of Plaintiff was an effort by Defendants to silence an election challenger, and it was part of a broader effort to intimidate and silence those who question the integrity of our elections (Targeting Policy). Consequently, this prosecution was initiated for an unlawful purpose, and it sent a chilling message throughout the election integrity community, as Defendants intended as this is the purpose of the Targeting Policy.

**FIRST CLAIM FOR RELIEF**
**(Freedom of Speech—First Amendment)**

99.   Plaintiff hereby incorporates by reference all stated paragraphs.

100.   By reason of the aforementioned decisions, laws, policies, practices, procedures, customs, acts, and/or omissions, including the Targeting Policy,

engaged in under color of state law, Defendants deprived Plaintiff of his right to freedom of speech by arresting, detaining, publicly casting him in a false light, and maliciously and selectively prosecuting him for engaging in political speech in violation of the Free Speech Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

101.   Michigan Compiled Laws § 750.543m is unconstitutional facially and as applied to Plaintiff's conduct, specifically including his speech, at the Oakland County recount as set forth in this First Amended Complaint, and it causes a chilling effect on political speech in violation of the Free Speech Clause of the First Amendment.

102.   On its face and as applied in this case, Michigan Compiled Laws § 750.543m is invalid under *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Watts v. United States*, 394 U.S. 705 (1969); *NAACP v. Claiborne Hardware Co,* 458 U.S. 886, 913 (1982); *Virginia v. Black*, 538 U.S. 343 (2003); and *Counterman v. Colorado*, 600 U.S. 66 (2023).

103.   The unlawful arrest and prosecution of Plaintiff as set forth in this First Amended Complaint also violates state law.  Pursuant to Michigan Compiled Laws § 750.543z, "a prosecuting agency *shall not* prosecute any person or seize any property for conduct presumptively protected by the first amendment to the

constitution of the United States in a manner that violates any constitutional provision." (emphasis added). And in August 2020, M. Crim. JI 38.4(3) was adopted, and it specifically provides that to prove the offense at issue, "the prosecution *must prove* that the threat"

> must have been a true threat, and not have been something like idle talk, or a statement made in jest, *or a political comment. It must have been made under circumstances where a reasonable person would think that others may take the threat seriously as expressing an intent to inflict harm or damage.*

104. Defendants arrested and maliciously and selectively prosecuted Plaintiff based on the content and viewpoint of his political speech and pursuant to the Targeting Policy, in violation of the Free Speech Clause of the First Amendment.

105. Defendants arrested, detained, publicly cast Plaintiff in a false light, and maliciously and selectively prosecuted him in retaliation for his speech.

106. Defendants' actions as set forth in this First Amended Complaint injured Plaintiff in a way likely to chill a person of ordinary firmness from further participation in free speech activity. Plaintiff's political viewpoint motivated Defendants' adverse actions. Thus, Defendants acted with a retaliatory intent or motive.

107. Defendants targeted Plaintiff for disfavored treatment and harassment because of Plaintiff's political viewpoints, as set forth in this First Amended Complaint, in violation of the First Amendment.

108.   Defendants' actions, as set forth in this First Amended Complaint, violated Plaintiff's right to freedom of speech protected by the Free Speech Clause of the First Amendment.

109.   As a direct and proximate result of Defendants' violation of the Free Speech Clause of the First Amendment, Plaintiff has suffered irreparable harm, including the loss of his constitutional rights, entitling him to declaratory and injunctive relief and damages, including damages for pain, suffering, humiliation, and emotional distress.

**SECOND CLAIM FOR RELIEF**
**(Malicious Prosecution—Fourth Amendment)**

110.   Plaintiff hereby incorporates by reference all stated paragraphs.

111.   By reason of the aforementioned decisions, laws, policies, practices, procedures, customs, acts, and/or omissions, including the Targeting Policy, engaged in under color of state law, Defendants have violated the Fourth Amendment to the United States Constitution as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 by maliciously prosecuting Plaintiff.

112.   As set forth in this First Amended Complaint, Defendants made, influenced, or participated in the decision to prosecute Plaintiff; there was no probable cause for the prosecution; as a consequence of the legal proceedings, Plaintiff suffered a deprivation of liberty apart from the initial arrest; and the criminal

proceeding was resolved in Plaintiff's favor, all in violation of the Fourth Amendment.

113.   As a direct and proximate result of Defendants' malicious prosecution and violation of the Fourth Amendment, Plaintiff has suffered irreparable harm, including the loss of his fundamental constitutional rights, entitling him to declaratory and injunctive relief and damages, including damages for pain, suffering, humiliation, and emotional distress.

### THIRD CLAIM FOR RELIEF
### (Equal Protection—Fourteenth Amendment)

114.   Plaintiff hereby incorporates by reference all stated paragraphs.

115.   By reason of the aforementioned decisions, laws, policies, practices, procedures, customs, acts, and/or omissions, including the Targeting Policy, engaged in under color of state law, Defendants Oakland County, McDonald, Bouchard, and Peschke have deprived Plaintiff of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 by targeting Plaintiff with a vindictive and bad faith prosecution on account of Plaintiff's political speech.

116.   Selective prosecution claims are premised upon the denial of equal protection.  Accordingly, Defendants' prosecution of Plaintiff deprived him of the equal protection guarantee of the Fourteenth Amendment.

117.   Defendants targeted and unlawfully prosecuted Plaintiff for engaging

in political speech in violation of the Equal Protection Clause of the Fourteenth Amendment.

118. Defendants targeted Plaintiff for disfavored treatment and harassment because of Plaintiff's political viewpoints, as set forth in this First Amended Complaint, in violation of the Fourteenth Amendment.

119. Defendants' enforcement of Michigan Compiled Laws § 750.543m against Plaintiff as set forth in this First Amended Complaint was arbitrary, capricious, discriminatory, and unreasonable in violation of the Equal Protection Clause of the Fourteenth Amendment.

120. By punishing Plaintiff for political speech based on the content and viewpoint of the speech, Defendants have deprived Plaintiff of the equal protection of the law.

121. Defendants' prosecution of Plaintiff was selective, invidious, in bad faith, and based on impermissible considerations, including Plaintiff's exercise of his constitutional rights.

122. The prosecution of Plaintiff as set forth in this First Amended Complaint also violates state law.  This further demonstrates the vindictive and bad faith nature of the prosecution.

123. As set forth in this First Amended Complaint, Defendants' adverse actions against Plaintiff were designed to intimidate, oppress, and punish Plaintiff

and similarly situated individuals who share Plaintiff's political viewpoints, in violation of the equal protection guarantee of the Fourteenth Amendment.

124.   As a direct and proximate result of Defendants' violation of the Equal Protection Clause and Defendants' selective and unlawful enforcement of Michigan Compiled Laws § 750.543m, Plaintiff has suffered irreparable harm, including the loss of his fundamental constitutional rights, entitling him to declaratory and injunctive relief and damages, including damages for pain, suffering, humiliation, and emotional distress.

## FOURTH CLAIM FOR RELIEF
### (Invasion of Privacy/False Light—Michigan Law)

125.   Plaintiff hereby incorporates by reference all stated paragraphs.

126.   By reason of the aforementioned false, unreasonable, and highly objectionable statements that were made and published to the public in general by Defendant Rozell as set forth in this First Amended Complaint, Defendant Rozell injured Plaintiff in violation of Michigan law.

127.   As set forth in this First Amended Complaint, Defendant Rozell broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to Plaintiff characteristics, conduct, and/or beliefs that were false and that placed Plaintiff in a false position.

128.   Defendant Rozell knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed.

129.   Defendant Rozell knew that the false, unreasonable, and highly objectionable statements were of and concerning Plaintiff.

130.   Defendant Rozell made and/or published the false, unreasonable, and highly objectionable statements about Plaintiff knowing that they would injure Plaintiff's reputation and cast him in a false light.

131.   Defendant Rozell made and/or published the false, unreasonable, and highly objectionable statements about Plaintiff with the intent to injure Plaintiff's reputation and to intimidate Plaintiff and others in order to chill their speech and prevent them from challenging or complaining about the conduct of election officials and the integrity of elections.

132.   Defendant Rozell made and/or published the false, unreasonable, and highly objectionable statements about Plaintiff with actual and expressed malice and a reckless disregard of the truth.

133.   As a direct and proximate result of Defendant Rozell's false, unreasonable, and highly objectionable statements, Plaintiff has suffered irreparable harm to his reputation, entitling him to declaratory and injunctive relief and damages, including damages for humiliation, loss of reputation, and emotional distress.

### FIFTH CLAIM FOR RELIEF
### (Right to Bear Arms— Second Amendment & Mich. Const. Article 1, § 6)

134.   Plaintiff hereby incorporates by reference all stated paragraphs.

135.   By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of State law, Defendants Oakland County, McDonald, Bouchard, and Peschke have deprived Plaintiff of his rights secured by the Second Amendment as applied to the States and their political subdivisions under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and Article 1, § 6 of the Michigan Constitution.

136.   Both the United States Constitution and the Michigan Constitution grant individuals a right to keep and bear arms for self-defense and to ensure the security of a free State.  The Second Amendment of the United States Constitution provides, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const., Am. II.  The Second Amendment is fully applicable to the states through the Fourteenth Amendment.  Article 1, § 6 of the 1963 Michigan Constitution, which is Michigan's equivalent to the Second Amendment, states, "Every person has a right to keep and bear arms for the defense of himself and the state."

137.   The Second Amendment and Article 1, § 6 guarantee an individual, including Plaintiff, the right to possess and carry weapons in case of confrontation and for personal safety and the safety of their families.  At the core of this protection is the right of citizens, such as Plaintiff, to use arms in defense of "hearth and home."

138. The deprivation of Plaintiff's rights guaranteed by the Second Amendment and Article 1, § 6 was a direct, foreseeable, and intended consequence of Defendants' unlawful, malicious, and selective arrest and prosecution of Plaintiff.

139. As a direct and proximate result of Defendants' violation of the Second Amendment and Article 1, § 6 as set forth in this First Amended Complaint, Plaintiff has suffered irreparable harm, including the loss of his fundamental constitutional rights, entitling him to declaratory and injunctive relief and damages.

## SIXTH CLAIM FOR RELIEF
### (Unlawful Seizure—Fourth Amendment)

140. Plaintiff hereby incorporates by reference all stated paragraphs.

141. By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants Oakland County, McDonald, Bouchard, and Peschke deprived Plaintiff of his rights protected by the Fourth Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

142. The Fourth Amendment protects against unreasonable seizures, including unlawful arrests.

143. Defendants violated the Fourth Amendment by unlawfully arresting and jailing Plaintiff in the Oakland County Jail and restraining his liberty as set forth in this First Amended Complaint without probable cause.

- 43 -

144.   As a direct and proximate result of Defendants' violation of the Fourth Amendment, Plaintiff has suffered irreparable harm, including the loss of his fundamental constitutional rights, entitling him to declaratory and injunctive relief and damages, including damages for pain, suffering, humiliation, and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court:

A)   to declare that Defendants violated Plaintiff's fundamental constitutional rights as set forth in this First Amended Complaint;

B)   to declare that Defendants violated Plaintiff's rights protected by Michigan law as set forth in this First Amended Complaint;

C)   to permanently enjoin Defendants Oakland County, Karen McDonald, Michael J. Bouchard, and Matthew Peschke from enforcing, in any way, Michigan Compiled Laws § 750.543m against Plaintiff for his conduct, specifically including his speech challenging the actions of election officials and the conduct of elections, including his conduct during the Oakland County recount held on or about December 15, 2023, as set forth in this First Amended Complaint;

D)   to declare that Michigan Compiled Laws § 750.543m is unconstitutional facially and as applied to Plaintiff's conduct, specifically including

his speech, during the Oakland County recount held on or about December 15, 2023, as set forth in this First Amended Complaint;

  E) to award Plaintiff nominal, compensatory, and punitive damages against all Defendants jointly and severally;

  F) to order Defendant Oakland County to permanently expunge all records referencing or relating to Plaintiff's arrest, charge, and prosecution as set forth in this First Amended Complaint;

  G) to award Plaintiff his reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

  H) to grant such other and further relief as this court should find just and proper.

## DEMAND FOR JURY TRIAL

  Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all issues triable of right by a jury.

  Respectfully submitted,

  **AMERICAN FREEDOM LAW CENTER**

  /s/ *Robert J. Muise*
  Robert J. Muise, Esq. (P62849)
  PO Box 131098
  Ann Arbor, Michigan 48113
  Tel: (734) 635-3756; Fax: (801) 760-3901
  rmuise@americanfreedomlawcenter.org

s/ *David Yerushalmi*
David Yerushalmi, Esq. (Ariz. Bar No. 009616;
DC Bar No. 978179; Cal. Bar No. 132011;
NY Bar No. 4632568)
6218 Georgia Avenue NW, Suite 1 #684
Washington, DC 20011-5125
Tel: (646) 262-0500; Fax: (801) 760-3901
dyerushalmi@americanfreedomlawcenter.org

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

AMERICAN FREEDOM LAW CENTER

/s/*Robert J. Muise*
Robert J. Muise, Esq.